# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA

## (ROANOKE DIVISION)

| | |
|---|---|
| UNITED STATES OF AMERICA, ET AL., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>SOUTHERN COAL CORPORATION, ET AL., )<br>)<br>Defendants. )<br>)<br>) | Civil Action No. 7:16-cv-00462-GEC |

**THE UNITED STATES' MEMORANDUM IN SUPPORT OF ITS
<u>UNOPPOSED MOTION TO ENTER THE CONSENT DECREE</u>**

On September 30, 2016, the United States, on behalf of the United States Environmental Protection Agency ("EPA"), lodged with this Court a proposed Consent Decree in the above-captioned action. The proposed Consent Decree resolves all claims alleged by the United States, the State of Alabama, the Commonwealth of Kentucky, the State of Tennessee, and the Commonwealth of Virginia in the Complaint filed in this action against Southern Coal Corporation, *et al*. for violations of the Clean Water Act. A thirty-day public notice and comment period has now passed, during which one comment was received. *See* Attachment A (comment letter). As the proposed Consent Decree is fair, reasonable, and consistent with the purposes of the Clean Water Act ("CWA"), the United States hereby requests that the Court approve and sign the Consent Decree lodged on September 30th, and enter it as the final judgement in this action. All parties support entry of the Consent Decree.

# BACKGROUND

## I. Complaint

On September 30, 2016, the United States and the State of Alabama, Commonwealth of Kentucky, State of Tennessee, and the Commonwealth of Virginia filed a Complaint against Defendants for violations of the CWA at coal operations across five states. Specifically, the Complaint alleges that the Defendants have violated the conditions and limitations of National Pollutant Discharge Elimination System ("NPDES") permits issued to them by the relevant State of Alabama, Commonwealth of Kentucky, State of Tennessee, Commonwealth of Virginia, and State of West Virginia pursuant to the EPA-approved permit program under Section 402 of the CWA, 33 U.S.C. § 1342(a), and the relevant AWPCA, Section 22-22-9, Code of Alabama, 1975; KRS § 224.16-050; TWQCA, Tenn. Code Ann. § 69-3-105(h); Va. Code § 45.1-254 and/or W. Va. Code § 22-11-4(a)(16). The Complaint also alleges that Defendants National Coal, LLC and Premium Coal Company, Incorporated, have failed to timely and/or fully respond to EPA's requests for information in violation of Section 308(a) of the CWA, 33 U.S.C. § 1318(a). The Complaint includes claims for injunctive relief and civil penalties pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d); and the relevant provisions of AWPCA at Sections 22-22-9, Code of Alabama, 1975; the Alabama Environmental Management Act at Section 22-22A-5(18), Code of Alabama, 1975; KRS § 224.99-020; TWQCA, Tenn. Code Ann. §§ 69-3-115 and 69-3-117; and Va. Code §§ 62.1-44.21, 44.23, and 44.32.

## II. Consent Decree

The United States and the State plaintiffs commenced negotiations with Defendants regarding the violations alleged in the Complaint approximately two years ago. All parties were represented by qualified counsel. The negotiations culminated in the proposed Consent Decree

lodged with this Court on September 30, 2016. A thirty-day public notice period commenced after notice of the Consent Decree was published in the Federal Register on October 7, 2016. 81 Fed. Reg. 195.

The Consent Decree contains multiple requirements designed to ensure future compliance with the CWA at the various coal operations:

- Defendants must implement an Environmental Management System (EMS) which includes the retention of an EMS consultant to assist in writing an EMS Manual, implementation of the EMS Manual, the retention of an EMS auditor who will review and submit a report on Defendants' compliance with the EMS, as well as submission of an EMS Audit Response and Action Plan to address any deficiencies found in the audit. CD ¶¶ 34-41.
- Defendants must, with the assistance of a third-party auditor, conduct Environmental Audits at all facilities to evaluate compliance with applicable environmental laws and the Consent Decree. Defendants must conduct audits of the treatment systems for each outlet at all facilities and must submit a status report to the EPA, DOI, and the States with any audit findings, including noncompliance, auditor's recommended measures, and schedule for achieving and maintaining compliance. CD ¶ 42-43.
- Defendants are required to conduct and develop protocols for outlet inspections, including inspections of ponds, at Discharge Monitoring Report Sample (DMR Sample) locations configured by the Defendants. CD ¶ 44-46.
- Defendants must implement a response plan for Effluent Limit and Failure to Sample Violations, which shall include provisions for investigation of violations and implementation of actions to achieve compliance with all NPDES Permit requirements.

> Minimum response requirements for different scenarios, such as responses to daily, monthly, or quarterly violations, are specified. CD ¶ 47.

- Defendants shall continue to implement and maintain an electronic Compliance Database to track sampling and compliance data. The information required to be recorded is specified in the CD. The Defendants shall assess the capability of the database with an EPA-approved Database Evaluator. CD ¶ 48-57.

- Defendants shall establish a website that shall make information regarding their NPDES Permits, sampling and monitoring data, violation information, along with other information, available to the public. CD ¶ 58-59.

- Defendants shall provide, require, and document annual formal training for all employees, contractors, and laboratory personnel whose responsibilities include environmental monitoring or compliance. CD ¶ 60-62.

In addition to the above requirements, the Defendants are required to pay a civil penalty of $900,000. CD Section V. The penalty was calculated based on the Defendants' financial condition, CD at 2 (¶ C) and ¶ 20, as discussed below. The civil penalty will be split between the United States and Alabama, Kentucky, Tennessee, and Virginia. CD ¶ 16. The Decree also provides a financial assurance mechanism to ensure that should the Defendants cease performing the injunctive relief provisions of the Decree, a Trustee will be appointed to continue the compliance activities. CD at 2(¶ D), Section VIII.

## STANDARD OF REVIEW

The standard to be applied in reviewing a proposed decree is whether the decree "is fair, adequate, and reasonable" and "not illegal, a product of collusion, or against the public interest." *United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999). A number of over-arching

principles apply to the determination of whether a consent decree meets this standard. First, the court "should be guided by the general principle that settlements are encouraged." *North Carolina*, 180 F.3d at 581; *see also*, *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990). This principle is "especially *apropos*" in complex environmental suits brought by the government which, if litigated to completion, would "consume a significant amount of time and expense by the parties, including the public fisc, along with a substantial redirection of judicial resources." *United States v. Arch Coal, Inc.*, 829 F. Supp. 2d 408, 416 (S.D. W.Va. 2011); *see also United States v. Patriot Coal Corp.*, No. 2:09-cv-0099, 2009 WL 1210622 at *5 (S.D. W.Va. April 30, 2009).

Second, the presumption in favor of settlement "is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field." *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1436 (6th Cir. 1991). Under these circumstances, "broad deference should be afforded to EPA's expertise," *United States v. District of Columbia*, 933 F. Supp. 42, 47 (D.D.C. 1996), and the "district court must refrain from second-guessing the Executive Branch." *Cannons Eng'g*, 899 F.2d at 84.

Third, the consent decree must be reviewed while bearing in mind that it is a settlement of claims and not a disposition after trial on the merits. *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990) (a consent decree "is not a decision on the merits or the achievement of the optimal outcome for all parties, but is the product of negotiation and compromise"). Thus, a decree may take into account "reasonable discounts for litigation risks, time savings, and the like that may be justified." *United States v. Davis*, 261 F.3d 1, 26 (1st Cir. 2001). And, in reviewing the consent decree, the standard is not whether the decree is "one which the court itself might

5

have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute." *Cannons Eng'g*, 899 F.2d at 84.

## ARGUMENT

**I.  THE CONSENT DECREE IS FAIR, ADEQUATE, REASONABLE, AND IN THE PUBLIC INTEREST.**

A review of the arms-length settlement process, the robust terms of the Decree, and the widespread environmental benefit that will be provided by the Decree demonstrates that the proposed Consent Decree is fair, adequate, reasonable, and in the public interest. *See North Carolina*, 180 F.3d at 581.

**A.  The Settlement Process Was Fair And Well Informed.**

First, the settlement process was extensive and well informed, and the Decree is not a product of collusion. *See North Carolina*, 180 F.3d at 581 (in considering the fairness and adequacy of a consent decree, the court should "consider the extent of discovery that has taken place, the stage of the proceedings, the want of collusion in the settlement and the experience of plaintiffs' counsel"). The Consent Decree was reached after two years of negotiations among the parties. Plaintiffs' negotiations were informed by information provided by enforcement programs within Alabama, Kentucky, Tennessee, Virginia and West Virginia; input from experienced technical staff within the relevant government agencies; and input from expert consultants hired by the United States. *Id.*; *see Patriot*, 2009 WL 1210622 at *5 (factor supporting entry of the decree was that plaintiffs "had a volume of noncompliance information at their disposal without the benefit of the discovery process").

In addition, negotiations were conducted by qualified counsel for each party, and both sides relied on technical staff and third-party experts in developing their proposed settlement

terms. Certain terms and obligations were contested, and over the course of negotiations there were multiple in-person meetings along with countless phone calls and emails, resulting in the exchange of numerous proposed injunctive relief drafts. There have been no allegations of collusion, nor can there be. Under these circumstances, "that so many affected parties, themselves knowledgeable and represented by experienced lawyers, have hammered out an agreement at arm's length and advocate its embodiment in a judicial decree, itself deserves weight in the ensuing balance." *Cannons Eng'g*, 899 F.2d at 84; *see also Bragg v. Robertson*, 83 F. Supp. 2d 713, 719 (S.D. W.Va. 2000) ("respect for the agency's role is heightened in a situation where the cards have been dealt face up and a crew of sophisticated players, with sharply conflicting interests, sit at the table.").

    **B.**  **The Consent Decree Is Designed To Achieve CWA Compliance.**

  Second, the proposed Consent Decree is fair, adequate, and reasonable because its measures are specifically designed to resolve the alleged violations. *See United States v. City of Welch*, W. Va., No. 1:11-cv-00647, 2012 WL 385489, *3 (S.D. W.Va. Feb. 6, 2012) (finding settlement "reasonable because it requires a comprehensive injunctive relief program designed to substantially reduce and eliminate CSO discharges."). The proposed Consent Decree requires Defendants to implement multiple, overlapping layers of injunctive relief. They must implement and audit, with the assistance of a third-party expert, a company-wide EMS which is designed to put in place consistent and accountable procedures to ensure individual and corporate compliance with all environmental responsibilities. CD ¶¶ at 34-41. They must conduct audits, with the assistance of a third-party environmental auditor, to evaluate compliance with applicable environmental law and the Consent Decree. *Id.* at ¶ 42. They must audit treatment systems at each outfall and implement corrective measures to ensure that the systems in place are

7

capable of maintaining compliance with the CWA. *Id*. at ¶ 43. All data relating to CWA performance and the required audits must be maintained in a centralized database and accessible by regulators. *Id*. at ¶¶ 49-56. Defendants must also establish and maintain a website or portal that is available to the public containing their permit and performance information. *Id.* at ¶¶ 58-59.

These provisions are more than adequate to address all the violations at issue and promote the objectives of the CWA. *See Bragg*, 83 F. Supp. 2d at 717 ("where a government agency charged with protecting the public interest has pulled the laboring oar in constructing the proposed settlement, a reviewing court may appropriately accord substantial weight to the agency's expertise and public interest responsibility"); *United States v. Comunidades Unidas Contra La Contaminacion*, 204 F.3d 275, 280 (1st Cir. 2000) (the policy in favor of settlements "has added bite where the settlement has been advanced for entry as a decree by a government actor 'committed to the protection of the public interest' and specially trained and oriented in the field.").

### C. The Consent Decree Will Provide Widespread Environmental Benefit.

Third, for all the reasons discussed above, the proposed Decree is consistent with the CWA, is not illegal, and serves the public interest. The injunctive relief is designed to prevent illegal discharges of pollutants from Defendants' facilities, a result which is wholly consistent with the CWA's purpose of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Moreover, entry of the Decree would ensure that the environmental benefits from these measures are immediately felt by the citizens of these states without the substantial expenditure of taxpayer and judicial resources that would

be necessitated by litigation. *Bragg*, 83 F. Supp. 2d at 717 ("It is precisely the desire to avoid a protracted examination of the parties' legal rights that underlies entry of consent decrees. Both the parties and the general public benefit from the saving of time and money that results from the voluntary settlement of litigation."). In sum, there can be no question that this Decree – which imposes expansive and far-reaching injunctive relief requirements while avoiding the delay, risk, and expense of protracted litigation – is in the public interest. *United States, et al. v. BP Prods. N. Am., Inc.*, No. 2:12-cv-207, 2012 WL 5411713, *3-4 (N.D. Ind. Nov. 6, 2012) (consent decree "serves the public interest by providing these environmental benefits more quickly and at less cost than could be achieved through litigation… a risky proposition with uncertain results."); *Arch*, 829 F. Supp. 2d at 417 (entering a consent decree where "it is apparent that plaintiffs have obtained large-scale water quality compliance without the cost, delay, and misdirection of resources that might have otherwise happened during time-consuming civil litigation.").

Should Defendants stop performance, the Decree contains specific financial assurance provisions that would serve as a backstop to ensure performance of their obligations. CD Section VIII. Under the Decree, performance would be assured by a Standby Trust, with Environmental Fund, LLC as trustee, and funded by an Irrevocable Letter of Credit in the amount of $4.5 million. CD ¶¶ 63-66. If the Defendants default on their work obligations, the EPA may, after providing notice and an opportunity to the Defendants to perform the required work, initiate the Trustee's responsibility to hire and fund contractors to satisfactorily perform the work using funding from the Letter of Credit. *Id*. ¶¶ 67-68.

The civil penalty is based on a determination that the Defendants have a limited financial ability to pay and to finance the requirements of the Consent Decree. This determination was made after an analysis of the financial information provided by the Defendants, identified in

Appendix A of the Decree. *Id*. ¶ 20. Resolution of liability is conditioned on the veracity and completeness of the financial information provided and if that information is found, in any material respect, to be false or inaccurate, all payments made by Defendants will be forfeited and the United States will have the ability to reinstate or commence a new action against the Defendants. *Id*. ¶¶ 124-125.

**D. The One Comment Received Does Not Impact the Foregoing Analysis**

Finally, the United States received a comment from Appalachian Mountain Advocates (on behalf of the Sierra Club, Southern Appalachian Mountain Stewards, Ohio Valley Environmental Coalition, West Virginia Highlands Conservancy, Tennessee Clean Water Network, Statewide Organizing for Community eMpowerment, Appalachian Voices, Appalachian Citizens' Law Center, and Black Warrior Riverkeeper) ("Citizens") requesting that the United States "confirm that it is the position of the United States" that the decree "does not preclude any citizen suit" against the Southern Coal Companies for CWA violations or violations of other environmental laws not specifically listed in Appendix F. *See* Clean Water Act Section 505(b)(1)(B) (statutory conditions for commencing citizen suits). Notably, the Citizens did not identify any specific provision of the Consent Decree as inadequate or otherwise incapable of ensuring compliance.

The Consent Decree includes two types of provisions regarding violations not in the Complaint and therefore not expressly settled. First, the Consent Decree includes reservation of rights language preserving the ability of federal and state regulators to pursue claims other than those settled by the Decree. CD ¶ 123. The Decree further states that "Defendants are responsible for achieving and maintaining complete compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree

10

shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein." CD ¶ 127. Thus, the Consent Decree preserves the ability of entities with primary enforcement authority to pursue post-Consent Decree violations, or any other violations not included in the Complaint.

Second, the Consent Decree includes a provision stating that the Decree does not limit the rights of third parties "except as otherwise provided by law." CD ¶ 128. The Consent Decree is otherwise silent as to whether any legal doctrine outside of the Decree would operate to preclude future citizen suits for non-settled violations.

The Consent Decree is forward-looking, contains multiple frameworks for bringing Defendants into compliance based on the type of violation, and imposes multiple compliance deadlines. As discussed above, the Decree also provides for stipulated penalties and a financial assurance mechanism to assure that Defendants comply with the law. Thus, the relief obtained for the matters alleged in the Complaint constitutes diligent prosecution for those violations, notwithstanding that certain violations may continue and are being addressed during the period of time in which the injunctive relief is being implemented. The plaintiffs intend to monitor Defendants' performance under the Decree and to avail themselves of the many mechanisms provided under the Decree should compliance with the Decree or the Act falter. S*ee* Declaration of Laurie Ireland at ¶¶ 10-11. Notably, the provisions of the Decree are already achieving a very substantial improvement in the compliance record of the Defendants. *See id.* at ¶ 9.

As to the future, the United States cannot assert an across-the-board opinion regarding the preclusive effect of the Decree on theoretical citizen suits without knowing the particular facts and types of claims involved. Whether or not future citizen suits are precluded by some legal doctrine outside of the Consent Decree is a determination most appropriately made by the

11

court in which the citizen suit is filed, based on the particular facts of the case before it, including whether Defendants are in compliance with the law or the Consent Decree at the time of a future suit and the actions of EPA and the States in response to any non-compliance. *See The Piney Run Pres. Ass'n v. The Cty. Comm'rs of Carroll County*, 523 F.3d 453, 456 (4th Cir. 2008) (jurisdiction for citizen's suit is normally determined as of the time of the filing of a complaint) citing *Chesapeake Bay Found. v. American Recovery Co.*, 769 F.2d 207, 208 (4th Cir.1985). In *Piney Run*, the court held that a government enforcement action will ordinarily be preclusive if the judicial action "is capable of requiring compliance with the Act and is in good faith calculated to do so." *Id.* at 459.

## CONCLUSION

In light of the lengthy negotiations process, the substantial injunctive relief provisions, and the broad-based and immediate environmental benefits the public will receive, it is clear that the Consent Decree "is fair, adequate, and reasonable" and "not illegal, a product of collusion, or against the public interest." *North Carolina*, 180 F.3d at 581. It ensures compliance at existing operations, reaches beyond violating facilities to impose company-wide preventive measures, and addresses environmental concerns broader in scope than those alleged in the Complaint – all the while avoiding the delay, risk, and expense of protracted litigation. For these reasons, the United States requests that this Court approve and enter the Consent Decree.

Respectfully submitted,

        JOHN C. CRUDEN
        Assistant Attorney General
        Environment & Natural Resources Division
        United States Department of Justice


        */s/ Lori Jonas*

LORI JONAS (CA Bar No.: 158268)
Senior Attorney
Tel: (202) 514-4080
Email: lori.jonas@usdoj.gov

LESLIE ALLEN (Wash. DC Bar No.: 421354)
Senior Attorney
Tel: (202) 514-4114
Email: leslie.allen@usdoj.gov

LEIGH P. RENDÉ  (PA Bar No.: 203452)
Trial Attorney
Tel: (202) 514-1461
Email: leigh.rende@usdoj.gov

PATRICK CASEY (FL Bar No.: 731048)
Senior Counsel
Tel: (202) 514-1448
Email: patrick.casey@usdoj.gov

Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044


JOHN P. FISHWICK JR.
United States Attorney
Western District of Virginia

ANTHONY GIORNO (VSB No.: 15830)
Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
310 1st Street, SW
Room 906
Roanoke, VA 24011
Tel: 540-857-2906
Email: anthony.giorno@usdoj.gov

OF COUNSEL:

MELISSA RAACK
Attorney-Advisor
U.S. Environmental Protection Agency
Office of Enforcement and Compliance Assurance
1200 Pennsylvania Avenue, NW
Washington, D.C. 20460

KAVITA K. NAGRANI
Associate Regional Counsel
U.S. Environmental Protection Agency, Region IV
61 Forsyth Street, S.W.
Atlanta, Georgia 30303

DOUG FRANKENTHALER
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region III
1650 Arch Street
Philadelphia, Pennsylvania 19103