IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ET AL., | ) |
| | ) |
| Plaintiffs, | ) Civil Action No. 7:16-cv-00462-GEC |
| | ) |
| v. | ) |
| | ) |
| SOUTHERN COAL CORPORATION. ET AL., | ) |
| | ) |
| Defendants. | ) |

**SOUTHERN COAL CORPORATION'S, PREMIUM COAL COMPANY, INC.'S, AND JUSTICE COAL OF ALABAMA, LLC'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL COMPLIANCE WITH THE CONSENT DECREE**

Plaintiffs' motion to compel[1] suffers from three principal flaws. *First*, and fatally, it exceeds the scope of the consent decree. The decree is a carefully tailored instrument that establishes certain agreed-upon requirements: a monetary penalty; a new compliance program; third-party audits of treatment systems and compliance; regular sampling; a violation-response plan; a database of compliance information; and training and reporting.[2] Plaintiffs do not dispute that Defendants have satisfied those mandates. And Defendants do not dispute that violating them would trigger stipulated penalties. But the decree's explicit mandates represent the limits of its scope. It does not subsume every law and permit to which Defendants are subject, nor does it transform every violation of those laws and permits into a stipulated-penalty event under the decree. Had the decree included such sweeping potential liability, Defendants never would have agreed to it.

---

[1] Dkt. No. 25.
[2] *See* Consent Decree §§ VII, IX (Dkt. No. 21) (hereinafter "Decree" or the "decree").

Crucially, the decree includes no requirement that Defendants renew their NPDES permits or comply with permit terms that require such renewals. Rather, the requirement to renew NPDES permits flows from sources *external* to the decree: the Clean Water Act (the "Act") and its implementing regulations, and the permits themselves. Plaintiffs allege that Defendants allowed certain NPDES permits in Alabama and Tennessee to lapse. On the basis of that allegation, they seek stipulated penalties under the decree. But the remedy for any permit lapses lies not in the decree but elsewhere—in other courts, through other procedural devices—because renewing NPDES permits was not a requirement of the decree.

*Second*, even if the decree applied, the motion to compel is premature. The decree sets forth a *mandatory* dispute resolution process that must be completed before judicial action is permitted. That process began on March 17, when Defendants sent Plaintiffs the Notice of Dispute that initiates the dispute resolution process pursuant to the decree. Under the schedule set by the decree, that process will conclude by June 10, 2021. The Court should either stay this case or dismiss it without prejudice pending completion of the dispute resolution process.

*Third*, even if the decree applied and the motion were ripe, Plaintiffs' penalty demand is grossly excessive and unsupported by the facts. In Tennessee, the state environmental regulator said more than six months ago that Defendants' mines could withdraw their applications for renewed NPDES permits because the permits soon would not be needed.[3] It is baffling that Plaintiffs now seek millions in penalties for "lapsed" permits that the regulator said were unneeded. In Alabama, meanwhile, the regulator delayed an NPDES permit for well over a year largely because of what it later acknowledged was a legal error. Permittees cannot be penalized

---

[3] Letter from Bryan W. Epperson, Mining Unit Manager, Tenn. Dept. of Env't & Conservation, to Jay Justice III & Bill Johnson (Sept. 21, 2020) (attached as Exhibit 1).

2

for permit delays caused by their regulators.[4] The nearly $3.2 million penalty that Plaintiffs seek, moreover, is grossly disproportionate to the compliance history of the mines in question, which have had a total of just two effluent-limit violations in the four-plus years of the decree. Under these circumstances, to subject Defendants to $3 million in penalties would be arbitrary, capricious, and an abuse of the regulatory agencies' discretion.[5] Before any penalty could be ordered, due process would entitle Defendants to discovery and the opportunity to present evidence on those issues and others. For all these reasons, Defendants oppose Plaintiffs' motion to compel.

## I.    Factual and procedural background

### A. The decree

On December 19, 2016, the Court entered a consent decree between the federal government and various state regulators, on the one hand, and Southern Coal Corporation and various of its affiliates, on the other; the parties to the motion to compel are a subset of the parties to the decree. The decree resolved alleged violations of the Act by establishing certain mechanisms to improve and monitor Defendants' compliance. It mandated a monetary penalty[6]

---

[4] *See, e.g.*, *United States v. Rueth Dev. Co.*, 189 F. Supp. 2d 874, 879-80 (N.D. Ind. 2001) (refusing to impose daily stipulated penalties that accrued due to EPA's delays); *United States v. Witco Corp.*, 76 F. Supp. 2d 519, 529-30 (D. Del. 1999) (refusing to impose daily stipulated penalties that accrued during the time it took to seek judicial review of obligations under a consent decree); *United States v. Pflueger*, No. CIV. 06-00140 BMK, 2007 WL 1876028, at *3-4 (D. Haw. June 27, 2007) (refusing to impose daily stipulated penalties that were caused by unforeseeable delay in obtaining a county permit that was required to complete work called for in the consent decree).

[5] The decree expressly permits Defendants to challenge actions by Plaintiffs that are "arbitrary and capricious or otherwise not in accordance with law." Decree ¶ 114(a). And it is a pillar of administrative law that government regulators, including environmental regulators, may not act arbitrarily and capriciously or abuse their discretion. *See, e.g.*, *Ergon-W. Va., Inc. v. Env't Prot. Agency*, 930 F.3d 403, 410 (4th Cir. 2020).

[6] Decree § V.

and certain compliance requirements found in its sections VI (general compliance requirements), VII (specific components of the compliance program), and IX (reporting and certification). It stipulated to further monetary penalties if those requirements were violated.[7] It required Defendants to post a $4.5 million letter of credit to backstop their environmental obligations.[8] And it established a dispute resolution process that must be exhausted before the parties initiate litigation.[9]

Defendants have complied with those requirements. It is undisputed that they established the mandated compliance program, conducted the mandated third-party audits, engaged in the mandated environmental monitoring, created the mandated database, provided the mandated training, and filed the mandated reports and certifications.[10] The Tennessee sites featured in the motion to compel have had no violations—*zero*—in the four-plus years of the decree.[11] The Poore Kirby mine in Alabama—the motion's other primary subject—has had only two.[12]

The decree did not incorporate a general mandate to comply with requirements from sources external to the decree. It did not, in other words, establish an affirmative requirement to follow, as a condition of the decree, all state and federal laws, or the terms of NPDES permits. No such requirement was necessary, since those obligations existed already in the law and the permits themselves. Conspicuously, instead of incorporating external authorities' requirements,

---

[7] *Id.* § X.
[8] *Id.* § VIII.
[9] *Id.* § XII.
[10] Plaintiffs have not contended that Defendants failed to comply with any of these mandates. To the extent the issue is disputed, Defendants reiterate the need for one or more evidentiary hearings to create a record upon which the Court may rule.
[11] Decl. of George W. Stephens ¶ 4(a) (attached as Exhibit 2).
[12] *Id.* ¶ 4(b). The Poore Kirby mine had effluent violations for dissolved thalium and pH in May 2017 for which Justice Coal paid a stipulated penalty of $1500. *Id.* That amount is the only penalty assessed against Defendants for all the NPDES permits at issue since the decree was entered. *Id.*

the decree merely clarified that it does not *relieve* Defendants of their duty to follow those authorities' mandates—a different concept entirely. Decree ¶ 21 ("This Decree in no way affects or relieves Defendants of their responsibility to comply with applicable federal, state, or local laws, regulations, and permits.").

### B. The lapsed permits

The Poore Kirby mine, owned by Defendant Justice Coal of Alabama, LLC ("Justice Coal"), has been inactive since at least 2014 but remains the subject of an NPDES permit. Its immediate past NPDES permit was issued May 16, 2014 and expired May 15, 2019. Under an Alabama regulation, the application to renew the permit was due 180 days before the permit expired. Justice Coal missed that deadline but sought renewal on March 6, 2019, more than two months *before* the permit's expiration. The Alabama Department of Environmental Management (ADEM) rejected that application, as well as a second one submitted May 10, 2019. ADEM's objections to those applications were addressed in a third application submitted July 26, 2019. ADEM rejected this third application on the premise that Poore Kirby could not receive an NPDES permit unless it had a state mining permit—but Poore Kirby could not obtain a mining permit because it was not an active mine. This Catch-22 persisted until ADEM eventually conceded that it had erred and the NPDES permit could issue without a predicate mining permit. The NPDES permit was issued on January 13, 2021. During the impasse triggered by ADEM's mistake, Justice Coal continued to observe all requirements of the previous permit—and of the decree—at the Poore Kirby mine and had no sampled discharges that exceeded effluent limits.

In Tennessee, Premium Coal Company, Inc. ("Premium") similarly holds NPDES permits for a number of mines that have been inactive for at least seven years. Premium has nearly completed its reclamation of those mine sites and expects its NPDES permit obligations to

be terminated there in the near future. Three of those permits, however, lapsed in May 2020. Premium applied to renew them in June 2020—but in September 2020, the Tennessee Department of Environment and Conservation (TDEC) informed Premium that the applications were unnecessary and could be withdrawn because the mines in question *no longer needed NPDES permits*.[13] The mines are in the final stages of reclamation and continue to observe the requirements of their prior NPDES permits while that work is completed. Every sampled discharge at those sites since the decree's inception has been compliant with the terms of the permits.

### C. Communications with the government

On September 2, 2020, the federal government sent Defendants a demand letter seeking the completion of reclamation work at Premium's Tennessee mines, along with stipulated penalties relating to the expired Alabama and Tennessee permits. Defendants quickly responded by launching additional reclamation efforts in Tennessee, which were largely completed in November 2020.[14] On November 20, 2020, Defendants sent the government a written response to the stipulated penalty claims along with a proposal for resolution; this included information about the effect of ADEM's error in withholding the Alabama NPDES permit.[15]  The government subsequently said it needed more information about Defendants' financial condition to evaluate their proposal. The government did not, however, specify the records it needed, so after a long period of silence extending through the holidays, Defendants reinitiated contact with

---

[13] *See* n. 3, *supra*.

[14] After the initial effort was completed in November 2020, TDEC forwarded a "punch list" of tasks needed to bring the reclamation to a close. That work was completed in January 2021. TDEC will conduct another inspection this spring.

[15] *See* Letter from Michael W. Carey to Patrick M. Casey (Nov. 20, 2020) (attached as Exhibit 3). This exhibit will be filed contemporaneously along with a motion to seal it.

a February 2, 2021 offer to provide whatever financial information the government required.[16] After another period of silence, the government responded that it did not accept Defendants' proposal but would consider further discussions to resolve the demand for penalties. As part of those discussions, Defendants contacted ADEM in an effort to advance a resolution of the penalty demand connected to ADEM's delays.[17]

The parties' ongoing discussions led Defendants to believe that they might avoid declaring a dispute under the decree and triggering the dispute resolution process. On March 11, 2021, however, with no notice to Defendants that it intended to abandon efforts to avoid a declaration of dispute, Plaintiffs filed a motion to compel, seeking $3,192,000 in stipulated penalties under the decree. Nearly the entire sum sought—$3,171,000—relates to the alleged lapse of the Alabama and Tennessee NPDES permits. The balance—$21,000—arises from a handful of alleged discharges without a permit.[18]

II.     **Argument**

    **A. Plaintiffs' claims are beyond the scope of the decree.**

Nearly five years after the decree's entry, Plaintiffs seek to vastly expand its scope to encompass every law on the books and every requirement in the host of NPDES permits that apply to Defendants' sites. The Supreme Court, however, long ago prohibited precisely the tactic that underpins Plaintiffs claims: The "scope of a consent decree must be discerned from within its four corners"; such a decree is not a generalized vehicle for enforcing statutory obligations not

---

[16] *See* Letter from Michael W. Carey to Patrick M. Casey (Feb. 2, 2021) (attached as Exhibit 4).
[17] As noted above, n.10, *supra*, to the extent any of the factual matter set forth in this opposition is disputed, an evidentiary hearing will assist the Court in establishing an appropriate record.
[18] *See* Attachments A and B to the Notice of Default (attached as Exhibit 5 & 6, respectively).

7

embodied in the decree itself. *United States v. Armour & Co.*, 402 U.S. 673, 674-75, 682 (1971).[19] The "narrow question" is whether the defendant's conduct violated the express terms of the decree. *Id.*[20] In this case, Plaintiffs cite four provisions of the decree to contend that it penalizes permit lapses, but none of them establishes any such mandate. Nor does any of the four provisions incorporate the terms of any NPDES permit, including any requirement relating to permit renewal.[21]

1. **Paragraph 22**

Paragraph 22 of the decree begins, "Defendants shall perform ***the work required by this Consent Decree*** in compliance with the requirements of all ***applicable*** federal, state, and local laws, regulations, and permits." (Emphasis added.) In other words, as Defendants carry out the tasks that the decree requires them to perform, they must do so in a manner consistent with whatever external sources of authority apply to those tasks; the decree is not a permission slip to violate other laws. Paragraph 22 thus continues Paragraph 21's passive characterization of the decree's relationship to laws and other sources of authority—it does not incorporate them, but it also does not excuse compliance with them. The effect of these provisions, taken together, is that if Defendants violate a law or a permit provision, they cannot raise the decree as a defense. What

---

[19] *See also Johnson v. Robinson*, 987 F.2d 1043, 1046 (4th Cir. 1993) ("[C]onsent decrees are to be interpreted as contracts."); *Willie M. v. Hunt*, 657 F.2d 55, 60 (4th Cir. 1981) ("[T]he scope of a consent decree must be discerned within its four corners.").
[20] *See also ITT Cont'l Baking Co.*, 420 U.S. at 236–37; *Hughes v. United States*, 342 U.S. 353, 357 (1952); *United States v. Atl. Ref. Co.*, 360 U.S. 19, 23–24 (1959).
[21] The meaning of these provisions of the decree—that is, the absence of any general incorporation of legal or permit conditions external to the decree itself—is apparent from the provisions' language. But were the Court to discern any ambiguity, it would construe that ambiguity against Plaintiffs, who drafted the decree. Consent decrees are to be interpreted as contracts, *Johnson v. Robinson*, 987 F.2d 1043, 1046 (4th Cir. 1993), and ambiguous contract provisions are construed against the drafter, *Maersk Line, Ltd. v. United States*, 513 F.3d 418, 423 (4th Cir. 2008).

Paragraph 22 does *not* do is incorporate all statutory and permit-based requirements to which Defendants are subject as requirements of the decree itself. It could have done so easily enough, but its drafters chose otherwise. (And reasonably so, since the obligation to follow external laws, permits, and so on already exists independent of the decree.) And Plaintiffs have not identified any task required by *the decree*—as distinct from some external source of authority—that Defendants performed in violation of a law or permit condition.

### 2. Paragraph 29

Paragraph 29 is similarly limited in scope. That is, it concerns only the manner in which Defendants perform tasks that are required by *the decree*—not the performance of tasks required by an external source of authority. It says, "Where any compliance obligation **under this decree** requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall [timely] obtain all such permits or approvals." (Emphasis added.) It does *not* incorporate a requirement to timely obtain any permit that might be required by law, or by another permit, or by some other source of authority external to the decree itself. As with Paragraph 22, a more expansive requirement easily could have been included, but the decree's drafters chose otherwise. And Plaintiffs have not identified a task required by *the decree*—as distinct from some external source of authority—that required Defendants to obtain the lapsed permits. That requirement, rather, came from outside the decree.

### 3. Paragraph 63

Paragraph 63 is part of the decree's section on financial assurance, which required Defendants to post a $4.5 million letter of credit upon which Plaintiffs could draw to fund certain tasks if Defendants did not complete the tasks on their own. The section defines the circumstances that would permit such a draw, under the label "the Work."[22] Three aspects of the definition are important:

(i) It expressly identifies the tasks that Defendants are required to carry out *under the decree itself*—the ones in sections VI, VII, and IX—and permits Plaintiffs to draw upon the letter of credit, if necessary, to complete those decree-mandated tasks.

(ii) It expressly identifies another category of tasks *external to the decree* and provides that those tasks—separate and apart from the tasks required by the decree—*also* can be funded by drawing upon the letter of credit. That broader, external category comprises tasks required by NPDES permits generally, beyond those required by the decree itself.

(iii) It is expressly limited to the financial assurance section. That is, it does not purport to expand the list of tasks that the decree requires Defendants to perform, which is set forth elsewhere in the document. Rather, it provides that the letter of credit may be used to fund **both** tasks required by the decree (sections VI, VII, and IX) **and** tasks required not by the decree but separately by Defendants' NPDES permits. Plaintiffs' memorandum offers a perfect example:

---

[22] Decree ¶ 63 ("*For purposes of this section*, the Work is defined as Sections VI (General Compliance Requirements), VII (Injunctive Relief), and IX (Reporting and Certification Requirements) of this Consent Decree, and taking all necessary additional actions to comply with the Defendants' NPDES permits for the term of the Consent Decree." (emphasis added)).

They have drawn upon the letter of credit to ensure remediation work in Tennessee that is required by Premium's *NPDES permits*—not by the decree itself.[23]

Paragraph 63, in other words, does not surreptitiously expand the decree so as to incorporate *all* requirements of all of Defendants' mountain of NPDES permits; secreting such a massive expansion of the decree in the letter-of-credit section would strain credulity.[24] Instead, Paragraph 63 expands the purposes for which the letter of credit can be used, so that the letter can fund both decree-mandated tasks and tasks independently mandated by NPDES permits. But it is the NPDES permits, not the decree, that remain the source of the obligation to carry out whatever tasks the permits require, including the obligation to renew them. Indeed, just a few paragraphs later, the decree expressly differentiates between violations of the decree itself and violations of Defendants' NPDES permits, foreclosing any notion that the permits' requirements are incorporated as part of the decree.[25]

### 4. Paragraph 85

Paragraph 85 specifies the monetary value of the stipulated penalty for any violation of a requirement of the decree, but it does not itself prescribe any additional requirements or define any additional violations. It therefore does not support Plaintiffs' contention that the permit lapses violated the decree.

---

[23] Memorandum in Support of the United States', State of Alabama's, and the State of Tennessee's Motion to Compel Compliance with the December 19, 2016 Consent Decree at 6-7 (Dkt. No. 26) (hereinafter "Memo.").

[24] *Cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Scalia, J.) (observing that Congress "does not, one might say, hide elephants in mouseholes").

[25] Decree ¶ 77 ("Whenever any violation of this Consent Decree ***or of any applicable NPDES or SMCRA Permit*** ...." (emphasis added)).

### B. The motion to compel is not ripe, and the case should be stayed—or dismissed without prejudice—until the informal dispute resolution process is complete.

Even if the relief that Plaintiffs seek were available under the decree, their motion to compel is premature. The decree establishes a dispute resolution process that is "the exclusive mechanism to resolve disputes arising under or with respect to" the decree.[26] That process has not yet been completed. It begins, under the decree, when Defendants send the federal government and the pertinent state regulators a written Notice of Dispute.[27] In this case, Defendants sent that notice on March 17, 2021.[28] The Notice of Dispute initiated a 30-day informal negotiation period.[29] At the conclusion of that period, if no resolution has been reached, Defendants will have 10 days to invoke the decree's *formal* dispute resolution procedures by serving upon the federal government and the pertinent state regulators a Statement of Position.[30] The government then has 45 days to serve a responsive Statement of Position, following which Defendants have 10 days to seek judicial resolution.[31]

The dispute resolution process is mandatory, not optional; as a part of the decree that this Court entered in 2016, it has the force of a court order. Plaintiffs cannot simply ignore it because they find it inconvenient, or because they perceive a strategic advantage in being first to the courthouse (even if it means abruptly abandoning the parties' ongoing efforts to avoid a dispute). Plaintiffs suggest that Defendants were somehow too late in invoking the dispute resolution process,[32] but as Plaintiffs surely know—since they drafted the decree—there is *no time limit* for

---

[26] Decree § XII.
[27] Decree ¶ 109.
[28] *See* Letter from Michael W. Carey to Patrick M. Casey, et al. (Mar. 17, 2021) (attached as Exhibit 7).
[29] Decree ¶ 109.
[30] *Id.*
[31] *Id.*
[32] Memo. at 5.

12

Defendants to send their Notice of Dispute. If Plaintiffs wanted such a deadline, they could have included it in the decree. They cannot now, though, evade the dispute resolution process that they themselves devised. Due process forbids it. The Court should either stay this case or dismiss it without prejudice pending the completion of the dispute resolution process.

### C. Plaintiffs' penalty demand is excessive; discovery and a hearing are required.

Even if the relief sought were available and the motion were ripe, Plaintiffs' penalty demand is grossly excessive and unsupported by the facts. Consider four points:

(i) In Tennessee, TDEC has informed Premium that it no longer needs the very NPDES permits whose lapse is the basis for Plaintiffs' penalty claim.

(ii) In Alabama, the majority of Plaintiffs' claim for an alleged permit lapse results from a legal error by ADEM.

(iii) The Tennessee and Alabama sites have had a combined total of *two* effluent-limit violations in the four-plus years of the decree.

(iv) Even during the alleged permit lapses, the Tennessee and Alabama sites have continued to comply with the effluent-limit standards of their most recent NPDES permits—and have had no violations.

Under these circumstances, subjecting Defendants to more than $3 million in penalties would be arbitrary and capricious—not just an abuse of discretion but a flagrant one. Defendants are entitled to discovery and an evidentiary hearing to establish those facts and permit the Court to make findings supported by the record.

### III. Conclusion

Plaintiffs have overreached. Five years ago, they drafted and agreed to a consent decree that did not incorporate external requirements found in state and federal statutes, regulations,

permits, and the like, but instead expressly provided that those requirements would continue to stand on their own, outside the decree. Now they ask the Court to expand the decree so radically that it would encompass every single legal, regulatory, or permit provision to which Defendants are subject anywhere in their operations. The Supreme Court forbade just such a maneuver nearly 50 years ago, and this Court cannot permit it now. *United States v. Armour & Co.*, 402 U.S. 673, 674-75, 682 (1971).

Even if the motion were viable under the decree, however, it is not yet ripe. The Court should stay the case or dismiss it without prejudice until the decree's mandatory dispute resolution process is completed. And even if Plaintiffs' motion is at some point adjudicated in this Court, due process would require substantial discovery and an evidentiary hearing; Plaintiffs' penalty demand is disproportionate to the facts and violates the arbitrary-and-capricious standard, and Defendants are entitled to an opportunity to prove it.

Respectfully submitted,

SOUTHERN COAL CORPORATION, ET AL.

By counsel,

/s/ Aaron B. Houchens
Aaron B. Houchens, VSB No. 80489
AARON B. HOUCHENS, P.C.
111 E. Main Street
P.O. Box 1250
Salem, Virginia  24153
(540) 389-4498
aaron@houchenslaw.com

and

 /s/ Michael W. Carey
Michael W. Carey, WVSB No. 635
*(admitted pro hac vice)*

14

        S. Benjamin Bryant, WVSB No. 520
*(admitted pro hac vice)*
Carey, Douglas, Kessler & Ruby, PLLC
901 Chase Tower
707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
(304) 345-1234
mwcarey@csdlawfirm.com
sbbryant@cdkrlaw.com

15

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

THE UNITED STATES OF AMERICA,
ET AL.,

        Plaintiffs,

v.                             Civil Action No. 7:16-CV-00462-GEC

SOUTHERN COAL CORPORATION,
ET AL.,

        Defendants.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing "Southern Coal Corporation's, Premium Coal Company, Inc.'s and Justice Coal of Alabama, LLC's Opposition to Plaintiffs' Motion to Compel Compliance With the Consent Decree" was electronically filed with the Clerk of the Court of the United States District Court for the Western District of Virginia by using the CM/ECF System, which will send notification of electronic filing to counsel of record on this the 25th day of March, 2021.

                                                    /s/ *Michael W. Carey*
                                                Michael W. Carey, WVSB No. 635