UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

ROANOKE DIVISION

```
* * * * * * * * * * * * * * * *
THE UNITED STATES OF AMERICA,*
et al.,                       * CIVIL ACTION 7:16-CV-00462
                              * MAY 14, 2021   12:36 P.M.
              Plaintiffs,     * MOTION HEARING VIA ZOOM
                              * VOLUME I OF I
vs.                           *
                              *
SOUTHERN COAL CORPORATION,    *
et al.,                       * Before:
                              * HONORABLE MICHAEL F. URBANSKI
              Defendants.     * UNITED STATES DISTRICT JUDGE
* * * * * * * * * * * * * * * * * WESTERN DISTRICT OF VIRGINIA
```

APPEARANCES:

For Plaintiff United States of America:

PATRICK CASEY, ESQUIRE
DOJ-ENRD
Poc Dave Tonrey
601 D Street, N.W., Room 2931
Washington, DC 20004

For Plaintiff State of Alabama, ex rel. Luther Strange:

ROBERT D. TAMBLING, ESQUIRE
Office of the Attorney General
State of Alabama
501 Washington Avenue
Montgomery, AL 36130

Court Reporter:        Judy K. Webb, RPR
                       210 Franklin Road, S.W., Room 540
                       Roanoke, Virginia 24011
                       (540)857-5100 Ext. 5333

        Proceedings recorded by mechanical stenography.
Transcript produced by computer.

U.S.A. v. Southern Coal - 5/14/2021

APPEARANCES (Continued):

For Plaintiff Alabama Department of Environmental Management:

                        CARRIE BLANTON, ESQUIRE
                        Ala. Dept. of Environmental Management
                        1400 Coliseum Boulevard
                        Montgomery, AL 36110


For Plaintiff the State of Tennessee, ex rel. Herbert H. Slatery III:

                        WILSON SINCLAIR BUNTIN, ESQUIRE
                        Tennessee Attorney General's Office
                        Environmental Division
                        P.O. Box 20207
                        Nashville, TN 37202


For the Defendants:

                        AARON BALLA HOUCHENS, ESQUIRE
                        Aaron B. Houchens, P.C.
                        111 East Main Street
                        Salem, VA 24153

                        MICHAEL WARREN CAREY, ESQUIRE
                        Carey, Douglas, Kessler & Ruby, PLLC
                        901 Chase Tower
                        707 Virginia Street, East
                        Charleston, WV 25301

                        ROBERT P. FOWLER, ESQUIRE
                        Balch & Bingham LLP
                        Environmental
                        1901 6th Avenue North, Suite 1500
                        Birmingham, AL 35203

(Court convened at 12:36 p.m.)

THE COURT:  Well, it looks like we changed court reporters.  I guess that's because the last court reporter has a hearing with Judge Jones in one hour, less than an hour.

Folks, let me just apologize for being tardy.  The 9:00 o'clock sentencing that we thought would -- typically we can deal with them in less than an hour, lasted more than three hours.  There were all kinds of detailed issues that were unforeseen that came up during the sentencing and I had to address them, and so I apologize for that.  I apologize for being late.

With that, let me say that I'm really glad I read all the materials that y'all filed before today; that way I'm not behind the eight ball.  But I think I have a -- I've got very detailed two bench memos, and I've read through all the briefs, and I've looked at the particular pages in the consent decree, paragraph 22, paragraph 27, and the other paragraphs involved, and I've highlighted those and tried to understand them.  I think I know what the issues are, but I look forward to hearing what you-all have to say at this argument today to help me out.

It looks to me like the dispute is centered on -- I'm sorry, it's paragraphs 22, 29, and I think 63, I think.

MR. CASEY:  That's correct, Your Honor.

THE COURT:  It looks to me like the dispute is

focused on the meaning of the word "work."  And so I look forward to hearing your argument on these issues, and I appreciate it very much.  So I will turn it over --

Well, let me ask the clerk, have you a called the case, Kristin?

THE CLERK:  No, I haven't.

THE COURT:  Let's go ahead and call the case, and then we'll turn it over to counsel for the plaintiff.

THE CLERK:  This is the *United States of America and others versus Southern Coal Corporation and others*, Civil Action Number 7:16CV00462.

THE COURT:  Okay.  Good afternoon.  Let's see.  This is on a motion filed by the plaintiffs in this case to this consent decree, so let me turn it over to you for your argument here today.

MR. CASEY:  Thank you, Your Honor.  My name is Pat Casey.  I am a senior counsel at the U.S. Department of Justice.  I represent U.S. Environmental Protection Agency in this case.

I'm joined today by Robert Tambling, the Assistant Attorney General for State of Alabama; Carrie Blanton, the associate general counsel for the Alabama Department of Environmental Conservation -- I'm sorry, the Alabama Department of Environmental Management; and Wilson Buntin, who is a senior attorney general for the State of Tennessee.

Your Honor, we're here on the United States', Alabama's, and Tennessee's motion to enforce compliance with the consent decree.  The defendants failed to comply with the express terms of the consent decree.

The consent decree contains multiple requirements designed to ensure compliance with the Clean Water Act, and the defendants were required to implement a response plan which included provisions for implementation of actions to achieve compliance with their national pollution discharge elimination system permits.  Those are also known as NPDES permit requirements.  Paragraph 47 of the consent decree requires that, and the defendants reported on their publicly available 2016 fourth quarter report that they had completed that violation response plan.

Your Honor, I appreciate to hear that you have read the briefs, because they are extensive.  There's a lot of detail, there's a lot of information, there's a lot of -- there's a lot of paragraphs in the consent decree; in fact, there's 145 paragraphs.  I will submit to the Court that there are realistically 14, if I exclude the paragraph 134, the Court retains jurisdiction.  But there's only 14 that really apply here to this motion.  If you would like, I'm happy to give you those paragraphs.

THE COURT:  I thought it was only three.  But if you tell me it's 14, I'm happy to hear which ones you think are

applicable.

MR. CASEY:  Let me just tell you, having read this Court's recent decision the *RLI Insurance versus Nexus Services* at 470 F. Supp. 3rd 564, I think you need to read the entire document, the whole consent decree in its entirety to understand specific paragraphs in this consent decree.

THE COURT:  You have just caused heartburn for me by mentioning the *RLI versus Nexus Services* case.  That case, holy cow, that thing was -- well, it's still not over yet, so that case has been tedious.

MR. CASEY:  And I appreciate, Your Honor, that there was -- the Court's rulings in that case were very applicable here, and I'm going to discuss that a little bit.  First let me tell you what paragraphs I think are relevant that the Court should refer to.  Paragraphs 13, 14(b), 14(eee), 22, 29, 47, 48, 54, 63, 67, 85, 92, and 108.  I'm sorry, there's one more, 114(b).

THE COURT:  Well, just by mentioning 14 paragraphs, you have now entered the realm of tedious.  So you need to keep me focused and drill down on what's important.

MR. CASEY:  I will, Your Honor.  This whole debate -- this whole dispute, as you've seen in the briefs, and I will refer back to the *RLI Insurance Company* case, is about contract interpretation, which this Court held is "intended to give effect to the intent of the contracting parties.  Where

the contract is not ambiguous or uncertain, its meaning must be determined from the words or language used."  In that case, the Court applied the four corners rule, which is argued by the defendants in this case, and which presumes that the written agreement speaks to the intention of the parties and that intention must be determined from the language used.

I will note in the *RLI* decision, and the Court was interpreting Illinois law but it's applicable here, is "The contract is to be construed as a whole, giving meaning to every" -- I'm sorry, "giving meaning and effect to every provision thereof, if possible, since it will be presumed that everything in the contract was inserted deliberately and for a purpose.  The intention of the parties is not to be gathered from detached portions of the contract or from any clause or provision standing by itself, but each part of the instrument must be viewed in light of the other parts."

The Court noted in the *RLI* case that, "It is fundamental in contract construction that, if possible, effect must be given to all of the language so that the provisions which appear to be conflicting or inconsistent may be reconciled and harmonized."

The Court went on to say, "The general rule is that contract provisions must be read in a manner that makes them consistent with each other, and a court is not to interpret an agreement in a way that would nullify any of the provisions of

the agreement or render them meaningless."

And the Court went on to indicate, "That the parties disagree as to the interpretation of terms does not render the contract ambiguous."

I will also note that this is consistent with Virginia law in the *Canal Insurance Company versus Lebanon Insurance Agency,* 504 F. Supp. 2d 113, in the Western District of Virginia in 2007, which indicated Virginia law applies to the four corners doctrine in analyzing a contract.  That's consistent with *Derbyshire*, D-E-R-B-Y-S-H-I-R-E, *Baptist Church versus Church Mutual Insurance Company*, 469 F. Supp. 3d 535, in the Eastern District of Virginia in 2020, in which the Court held, "Under Virginia law, courts must construe the language of a contract as written.  Courts cannot make a new contract for the parties different from what is plainly intended."

And finally, the *RW Partners versus Virginia Electric and Power Company* case, 899 F. Supp. 1490, in the Eastern District of Virginia, 1995.  In that case the Court held that a "contract must be construed as a whole so as to give effect to all its provisions and in a way that will avoid unreasonable results."  The contract must be "read as a whole and interpreted to give reasonable meaning to all of its provisions."

Now, as we indicated in our motion to compel, during

the period of time between May and August of 2020, the defendants repeatedly failed to comply with the consent decree.  As a result, the United States, on September 2nd, 2020, issued a demand for stipulated penalties and notice of default because the defendants failed to submit timely permit applications and maintain permit coverage for 11 sites in Tennessee, resulting in unpermitted discharges for three sites.  The demand provided notice that defendants also failed to timely submit applications for three permits in Alabama, resulting in failure to maintain permit coverage for one site and unpermitted -- I'm sorry, to maintain the coverage for one site and unpermitted discharges from that site.

That demand notice that the failure to maintain the NPDES permit coverage and resulting unpermitted discharges are violations of paragraphs 22 and 29 and the Clean Water Act. The demand provided that the defendants were required under 22, 29, and 63 of the consent decree to take all necessary actions to comply with their NPDES permits.

The demand -- the motion to compel required payment of stipulated penalties --

THE COURT:  Well, they argued, "No.  No.  No.  It doesn't mean that.  You can't read all of that into the consent decree.  And because we didn't timely renew our permits doesn't mean that we're in violation of 22 and 29 and 63."  What do you say to that, Mr. Casey?

U.S.A. v. Southern Coal - 5/14/2021

MR. CASEY:  Your Honor, the whole consent decree, the basis for it was to prevent illegal discharges from the defendants' facilities.  You have to remember in December 2016 the consent decree was entered and approved by Judge Conrad, and the whole point of the consent decree was to prevent illegal discharges from the defendants' facilities, okay?  If you don't apply for your permit, then there's nothing to report pursuant to the terms of the permit and the terms of this consent decree.  All the work that's required under this consent decree could be avoided if they don't renew their permit and if it's not put in place.

A lot of this program under the Clean Water Act is voluntary reporting requirements, and when they have -- if they let their permits expire, any discharges from those facilities, okay, are illegal discharges and violations of the Clean Water Act.

The whole idea here is that the defendants had a horrendous history of permit and Clean Water Act violations.  In fact, the consent decree resolved 23,000 violations, okay?  And so the whole idea here, after two years of negotiations to get this consent decree in place, is to prevent those illegal discharges.  So if you don't apply for a permit, those discharges occur, okay?  So it makes no sense -- I'm sorry, Your Honor, go ahead.

THE COURT:  I was just -- I'll let you finish your

thought.

MR. CASEY:  It makes no sense to allow your permits to expire and then have discharges which would then become illegal.  It doesn't matter what the parameters are in the permit.

THE COURT:  Okay.  And that would not really violate the permit but it would violate the Clean Water Act.

MR. CASEY:  It would violate the permit, it would violate the Clean Water Act, and it would violate the provisions of paragraphs 22 and 29.

THE COURT:  Now, is it the position of the plaintiffs that part of the work as defined in this agreement is to keep your permits in place and to apply for appropriate permits?

MR. CASEY:  It's required by the permit, okay?  And the consent decree indicates in paragraph 22 that the defendant shall perform the work, which is this reporting and making sure they meet the requirements of the permits, okay?  They shall perform in accordance with the requirements of their permits.  Paragraph 29 says, "Where any compliance under this decree requires defendants to obtain permits, defendants shall submit timely and complete applications and take all other actions necessary to obtain all such permits."  Okay?

Now, you'll --

THE COURT:  Therefore, you argue a failure to take all other actions necessary to retain permits or approvals

violates paragraph 29, violates the consent decree?

MR. CASEY:  That's correct, Your Honor.

THE COURT:  Now, explain to me, I'm no Clean Water Act guy, if you don't have a permit and you discharge materials, you know, into waters, what is the -- why is that a problem under the Clean Water Act versus discharging it if you have a permit?  Tell me what the -- is one monitored and one not monitored?  Is that how that works?

MR. CASEY:  Well, if there's a discharge, okay, without a permit, it's a violation of the Clean Water Act, Section 33 1319, Your Honor.

If there's a permit, okay, and there's -- the permit will allow -- allows the facility to discharge to waters under certain limitations.  If they don't have a permit, there's no limitations, so any discharge of a pollutant to the waters is a violation of the Clean Water Act.  If they have a permit, they are permitted to discharge pollutants with certain limitations.

THE COURT:  Okay.  Now, one of the defendants argue in this is, "Oh, come on.  These are just -- we just didn't do it in a timely fashion.  You know, these are -- these penalties are grossly outrageous.  These particular facilities hardly ever engaged in any violations or engaged in any discharges.  This is a gross overstatement of the problem here."  What do you say to that?

U.S.A. v. Southern Coal - 5/14/2021

MR. CASEY: Your Honor, the whole idea here was we filed a lawsuit, as you are aware, in 2016, after two years of negotiation, based on over 23,000 violations of their permits and the Clean Water Act. We came up with a regimen here, included in this agreement, under this contract that was approved by the Court, which is now a court order, that they would take certain steps to improve their compliance, okay, meet the parameters of their permits, and meet the requirements of the Clean Water Act, okay? These are not paper violations.

When we issued a demand to do the work to see some permitted discharges back in September of 2020, as of April 15th, 2021, the last inspection performed by the Tennessee Department of Environmental Conservation, that work was still not completed at two out of the three sites that were in the demand from September 2020.

The whole idea here is compliance, and if they don't perform the requirements under this consent decree, there is no assurance of compliance. These are not paperworks. These are continuing violations that have gone on for eight, nine months now, since we issued that order. The consent decree was --

THE COURT: Well, I guess that was my question. My question is, is this just a timing and paperwork issue or are there real violations of the Clean Water Act that we're

addressing here?

MR. CASEY:  Oh, there are real violations.  If you don't have a permit, if it has expired, you have real violations.  You have discharges without a permit.  Secondly, we just had a notice just this month, on May 4th, Tennessee noticed the defendants Premium Coal Company, Inc. that they had a violation of their permit and issued a notice of violation.  These notices have continued.

If you look at their compliance history, since the effective date of the 2016 consent decree the defendants have paid stipulated penalties in excess of $2 million, almost $3 million, Your Honor.  These violations are continuing, okay?  And the consent decree was set up to say, "Look, you're going to continue to pay stipulated penalties if you continue to have violations, okay?  And you will not be released from this consent decree unless you demonstrate at least three years of substantial compliance with the terms of this consent decree."

Now, if the consent decree was complete -- and that hasn't happened, Your Honor.

THE COURT:  Okay.  Go ahead.  Sorry for interrupting.

MR. CASEY:  You put your -- you put your finger right on the most important paragraphs here, paragraphs 22, 29, and 63.  Now --

THE COURT:  Yeah, and I even highlighted them in my

notebook.

MR. CASEY: Excellent. Excellent. I'm a big highlighter, but by the time I get through highlighting, I've usually covered the whole page.

Your Honor, paragraph 14(eee) is the definition of "work" in the consent decree, and that definition refers to paragraph -- the definition provided under paragraph 63. Paragraph 63 provides that "work" is defined as Section 6, General Compliance Requirements, okay, including other sections, and taking all necessary actions to comply with the defendants' NPDES permits, okay?

As I mentioned, this definition includes Section 6, General Compliance Requirements. That section includes specifically paragraphs 22 and 29. So the work performed under this consent decree and included in the definition includes paragraphs 22 and 29. They have to comply with their permits, they have to renew their permits, they have to meet the limits under those permits, they have to report, they have to monitor and report those violations to, you know, to whatever state environmental agency is required to do that.

THE COURT: Does the Court even need to look back at 22 and 29? Because what about the language that says, "and taking all necessary actions to comply with the permits for the term of the consent decree"? Shouldn't that include keeping your permits up-to-date?

MR. CASEY:  That's correct, Your Honor.

THE COURT:  Now, what about the argument that in paragraph 63 and in 14(eee) the "work" is used a capital W, and in paragraph 22 "work" is used with -- it's a small W?

MR. CASEY:  Well, you know, you're trying to isolate -- they're trying to take it out of context of the contract as a whole, like we mentioned in the *RLI* case.  But you have to remember, the definition in paragraph 63, which is referred to in paragraph 14(eee), okay, capital "work," capital W work includes -- is defined as including Section 6, General Compliance Requirements.  The General Compliance Requirements --

THE COURT:  Tell me what that means, okay?  So I'm trying to figure out -- because I know what work is, right?  You get up in the morning and you drive to the office, right?  That's -- or in this case maybe you get your shovel or you plant your -- you plant your grass seed to remediate, okay?

MR. CASEY:  Right.

THE COURT:  I get what work is.  Tell me how you understand paragraph 63 to work.  Well, I hate to use that word.  Tell me how you understand paragraph -- the meaning of paragraph 63, because it says the "Work" is defined as a section.  Now, to me it's like, wait a minute, the work that is required by the consent decree is defined in a section of the consent decree?  Tell me conceptually how I'm supposed to

understand those terms.

MR. CASEY:  Your Honor, work is defined as -- let me look at the language here -- is defined as Section 6, General Compliance Requirements.  If you go to Section 6, the General Compliance Requirements, those are paragraphs -- these are all the things that are required to be done by the defendants under this consent decree.  That's the work that they are supposed to do under the terms of this consent decree.  How --

THE COURT:  Is 63 and 22 a bit circular?  I mean, is it a bit circular?  Because you say, okay, work is defined as what's in Section 6.  And then in paragraph 22, in Section 6, it says, you shall perform work required by this consent decree.  Isn't that a bit circular?

MR. CASEY:  Your Honor, I don't see it as circular; I don't at all.  I see it as referring to the sections that are compliance requirements and the injunctive relief required under this company.  That consent decree is the terms that were agreed to and ordered by this Court that they have to do, and hopefully if they do that, okay, there will not be violations of their permits or violations of their Clean Water Act.  If they do violate their permits, if they do not comply with their permits, not get the permits, have illegal discharges, then the consent decree in paragraph 85 requires them to pay stipulated penalties.  There's a number of -- 85, 86, depending on the type of violation.  In this case

paragraph 85 refers to violations of the consent decree under certain agreed to, stipulated penalties.

THE COURT:  Okay.  All right, thank you for that.  Go ahead.

MR. CASEY:  So I just wanted to go through that.  We went through 22, we went through 29.

I also wanted to mention that pursuant to paragraph 67, September demand required the defendants to complete the necessary work within 30 days, and pursuant to paragraph 92, pay the stipulated penalties within 30 days.  The defendants never served a notice of dispute.  They never served a formal notice of dispute.  They never -- I'm sorry, they did serve a notice of dispute in December of 2020, but it did not even mention or dispute the demanded stipulated penalties or the demanded work.  They did not issue or serve a formal dispute resolution to that, and they did not seek judicial resolution.

And in paragraph 108 of the consent decree, they are precluded from raising that failure to dispute it in an action by the United States or the States to enforce the terms of this consent decree.  They did not file their dispute -- or serve their dispute resolution until after we had filed this current motion to compel compliance with the consent decree.  Okay?

The defendants opposed our motion to --

THE COURT:  So, Mr. Casey, is it your argument that

pursuant to paragraph 108 any defenses are waived?

MR. CASEY:  On these issues, on the demand for stips and for the work to be completed in Tennessee, yes, Your Honor.  And I believe that their late filing of dispute resolution and their motion seeking judicial resolution of that dispute should not be -- should not be considered by the Court.  If it is, I'd be happy to discuss that as well.

THE COURT:  All right.  Go ahead.

MR. CASEY:  Okay.  So the defendants filed a response to our opposition.  They argued that claims are beyond the scope of the consent decree, and that they have not identified a task.  But if you look at their argument in their opposition, Your Honor, on page 10, they discuss paragraph 63, and they indicate in their Note 22 that it indicates that "work" is defined as Section 6.  And as I said earlier, Section 6 includes paragraphs 22 and 29.

They also argue that there are aspects of the definition that are important.  Specifically, they indicate in their opposition, again on page 10 of their opposition, "It," the definition they're referring to, "expressly identifies the tasks that defendants are required to carry out under the decree itself, the ones in" --

THE COURT:  If they argue that we -- or keeping the permits up-to-date and making sure the permit applications are all in is a task external to the decree and that there are

other remedies there that are -- that the environmental state and federal regulators have that are external to the decree as opposed to finding a violation of the consent decree.  What do you say to that, Mr. Casey?

MR. CASEY:  Well, we've reserved our rights, Your Honor.  Yes, they are violations outside of the consent decree, but there are also violations of this particular consent decree.  We reserved our rights, the States and the United States, to seek all appropriate remedies, which would include filing another lawsuit -- basically, what they're arguing is, "Judge, you can't hear this to try to enforce the terms of this consent decree.  They need to go file another lawsuit and be heard either in this court or another court" --

THE COURT:  Right, for having discharges without a permit, for violations of the Clean Water Act.

MR. CASEY:  That's right.  That's right.

THE COURT:  I get that.

MR. CASEY:  And also to take it to, you know, the most ridiculous further out argument they could make, if under this they do not renew their permits, then there's no permits to report that they've complied with or not complied with.  We wouldn't know if they were violating the permits if they weren't reporting.

We wouldn't know if they -- remember, Judge, they pointed out in their argument that a number of these permits,

after their opposition brief was filed they formally withdrew their pending permit renewal applications for many of the sites, for 11 sites in Tennessee, okay?  Because they said -- and they indicated in Tennessee, as well as Alabama, many of these sites were not active mines.  Why?  Because the market was depressed.  But they kept their permits there.  One, if they had discharges, they're required to have a permit whether they're mining or not; and, two, they want to restart mining depending on the market.  If the market goes up and there's a big need for coal, okay, they will start those mines.  They won't have to wait 180 days or whatever time it takes to get a new permit; they'll have it in place.  That's why they kept these permits in place.

Now, because the market has been down turned for coal for quite some time, they have been inactive, okay?  So that's why they're keeping their permits.  I forgot -- I had a big point I was going to tell you, but I can't remember what it was.  Sorry, Your Honor.

THE COURT:  Well, I keep interrupting you.  One of the things that comes to mind when I look at their submissions is they say -- I think it's with regard to Tennessee, is, "Look, Tennessee, Tennessee told us we don't even need to have these permits for three locations, so how can you tag us with violations for three locations in Tennessee where they -- where the state said, 'Oh, you're right, you don't need these

permits anymore'"?

MR. CASEY: That's true for a number of their inactive sites that are stable. And I'll let the Assistant Attorney General for Tennessee explain this a little more definitively. But there were 11 permits in Tennessee that expired, okay? They failed. When we issued the demand and notified them, they went ahead and submitted renewal applications, untimely, but they submitted them.

When they realized that some of these sites were stable, were not discharging, and the states said, "Look, we went out and inspected here. If these are not discharging, if you don't want to keep these permits, you don't have to. If you want to start up, you can go ahead reapply. We don't know how long that will take, but you can do that."

For three of those sites in Tennessee, however, those three sites, which are the only sites in Tennessee that we are seeking stipulated penalties for, those sites were not stable and those sites had unpermitted discharges for. We are not seeking stipulated penalties for the other sites that were stabilized. Even though they let their permits expire, we didn't seek any penalties, we didn't seek any injunctive relief or any demand for work at those sites.

Same thing in Alabama: Three permits expired, one of those permits, however, had unpermitted discharges. That's the only site and permit in Alabama which we're seeking a

stipulated penalty for.  We're not seeking it for any of the other sites, Your Honor.

But I want to note that in their opposition, as I started to say, Your Honor, the aspects of the definition are important -- the aspects of the definition of paragraph 63 that the defendants say are important is, is it expressly identifies the tasks that defendants are required to carry out under the decree itself, the ones in Section 6, as well as 7 and 9.  Section 6, like I say, includes paragraphs 22 and 29, okay?

They also argue that the motion to compel is not ripe, but under their dispute notice in December of 2020, they never raised the issues of the demanded work or the steps. And, three, they argue that the penalty demand is excessive and the plaintiffs have, therefore, overreached, and they cite the *U.S. versus Armour* case, which I talked about a little bit earlier, I believe.

Okay.  In response to that, the plaintiffs filed a rebuttal.  In that rebuttal we remind -- we remind the Court that there are factual allegations in the defendant's opposition that are undisputed:

One:  The consent decree is a carefully tailored instrument that establishes certain agreed-upon requirements.

Violating the agreed-upon requirements would trigger stips.

Third:  The parties are subject to the consent decree.

Four:  The decree established certain mechanisms to improve and monitor the defendant's compliance.

Five:  The decree mandated certain compliance requirements.  Those are in Section 6, including paragraphs 22 and 29.

And the decree stipulated to penalties if compliance requirements were violated.

These are the defendants' allegations.

Also undisputed are the allegations made by the defendants in their opposition that the Poore Kirby Mine, although it's inactive since 2014, it remains subject to the NPDES permit.  That's what I forgot.  I was reminded just then, Judge.

I want the Court to look carefully at exhibit, I believe it's 45 -- I can look that up real quick -- which was a sealed document.  Yes.  Because it's a sealed document, I do not want to discuss it in this public hearing, but I'm going to ask the Court to carefully review -- I believe it's paragraphs 1 through 8 of that document, for a number of the defendant's admissions and their excuses that are inconsistent with the consent decree.

But let me finish on the undisputed allegations.  The defendants allege that the NPDES permit in Alabama for the

U.S.A. v. Southern Coal - 5/14/2021

Poore Kirby Mine expired on May 15, 2019.  And under the permit and the Alabama regs, renewal application was due 180 days prior to expiration.  Justice Coal missed that deadline. Justice Coal completed the application in July 26, 2019, and ADEM issued the permit on January 13th, 2021.

In Tennessee, the defendants allege that Premium has NPDES permits for mines that have been inactive for at least seven years, and they allege and it's undisputed that Premium allowed its NPDES permits to expire.

In response to their arguments about the scope of the consent decree, they cite the *U.S. versus Armour & Company* case.  That case, and I quote, provides, "The scope of the consent decree must be discerned within its four corners.  The defendant has, by the decree, waived its right to litigate the issues raised, a rate guaranteed by the due process clause, and the conditions upon which he is given the waiver must be represented, and the instrument must be construed as written."

And we've talked about the cases, the RLI Insurance case versus Nexus -- *RLI versus Nexus* case and *Canal Insurance* case, okay?  We talked about the requirements of paragraph 22, the defendant shall perform the work in compliance with the requirements of the applicable permits.  Paragraph 14(eee): The "Work means the actions described in paragraph 63," which provides, "The Work is defined as the work -- "The Work is defined as Section 6 (General Compliance Requirements)" among

others, "and taking all necessary additional actions to comply with the defendants' NPDES permits."

In paragraph -- that's number one.

Number 2:  Paragraph 29 provides, "Where any compliance obligation requires defendants to obtain a permit, defendant shall submit timely and complete applications and take all other action necessary to obtain such permits."

Three:  The defined meaning of work in paragraph 14(eee) is provided in paragraph 63, which we have discussed.

Fourth:  Paragraph 85 provides mandatory stips under this paragraph for the defendant's violations with paragraphs 22, 29, and with the related paragraph 63.

The second point is to respond to their argument that the motion is not ripe.  They served a notice of dispute resolution in December, actually December 10th, 2020, and they did not object or raise the demanded work or the stips.  Nor did they invoke formal dispute resolution, and they did not seek judicial review.  Their failure to seek resolution of the dispute precludes the defendants from raising such an issue as a defense to the enforcement action here by the United States and the States under paragraph 108.

And the third point, the stipulated penalty demand is supported by the express terms of the consent decree.  Okay?

First:  The defendants admit the consent decree was a carefully tailored instrument and established certain

agreed-upon requirements.  The defendants' opposition, page 1.

Second:  The defendants do not dispute that violating the consent decree requirements would trigger stipulated penalties.  Defendants' opposition, page 1.

Third:  The defendants admit that the decree mandated monetary penalties if those compliance requirements were violated.  Defendant's opposition, page 4.

Fourth:  The defendants admit that the NPDES permit for the Poore Kirby Mine in Alabama expired on May 15, 2019.  And under Alabama regs and the permit, the permit renewal application was due 180 days before the permit expired.  They admit that Alabama Coal missed that deadline and did not submit a complete application until July 26, 2019.

Fifth:  The defendants admit that three permits in Tennessee expired.  Actually, it was 11, Your Honor, but -- in the defendants' opposition, Exhibit 1, page 1.  These undisputed alleged facts support the imposition of stipulated penalties under the consent decree under paragraphs 22, 29, 63, and 85.  The defendants' failure to comply with the consent decree and permit renewal requirements resulted in unpermitted discharges in both Alabama and Tennessee.

THE COURT:  Let me just circle back to something you said earlier, Mr. Casey, and I want to make sure about that.

MR. CASEY:  Yes, sir.

THE COURT:  The $3 million plus of stipulated

U.S.A. v. Southern Coal - 5/14/2021

penalties, I thought you said, and you've got to correct me if I'm wrong, that those stipulated penalties only apply to sites at which there was both no permits and there was discharge.

MR. CASEY:  That's correct, Your Honor.  If I look at the demand, I believe -- just a second, let me double-check the attachments to the demand.  If I look at the demand, Your Honor, which is found at document 26-4, Attachment A provides for a lapse in permit for three cites, and the stipulated penalties for the days of violation of those three sites. That's the refuge area Number 2, mine Number 5A, and mine Number 20, okay?  Those are the only stipulated penalties they were seeking in Tennessee, and those are all for permits that had discharges.

THE COURT:  What about in Alabama?

MR. CASEY:  I'm looking at that.  In Alabama, there was -- most of the violations were for the Poore Kirby Mine for failure to submit timely application and unpermitted discharges, and the lapse -- failure to submit the timely application and the lapse, the days that the permit was expired, plus the unpermitted discharges.

There were two violations for failure to submit a timely application, one for Crane Central Mine and one for the Glade Preparation Plant.  Those stipulated penalties were $1,000 each.

If I said it was just for the discharge facilities, I

misspoke.  I'm sorry, Your Honor.

THE COURT:  So there are some stipulated penalties associated with facilities at which there were not discharges?

MR. CASEY:  That's correct, Your Honor.  Just two facilities in Alabama, and for each of those facilities:  The Crane Central Mine, the stipulated penalty was failure to submit a timely application.  The penalty date was May 6th, 2020, and the stipulated penalties was $1,000.  And the Glade Preparation Plant, the violation was failure to submit a timely application on May 6th, 2020, and that stipulated penalty was also $1,000.

THE COURT:  Okay.  But the vast majority of those penalties are for facilities that were both unpermitted and for which there was a discharge?

MR. CASEY:  That's correct, Your Honor.

THE COURT:  Okay.  Go ahead, Mr. Casey.

MR. CASEY:  The only thing I was just going to get to when you were talking about the stipulated penalties, we are not asking for stipulated penalties for continuing violations -- for a continuing violation, Your Honor.  We are not seeking interest, we are not seeking a statutory max, and we're not seeking stips for all of the expired permits.

Your Honor, the stipulated penalties are a small fraction of the maximum civil penalty under the Clean Water Act, which currently is $56,540 per day per violation.  Under

this consent decree we are seeking stipulated penalties of $1,000 per day for the first 14 days of violation, $2,500 a day for the violations of the 15th through the 30th day, and $4,500 for the 31st day and beyond.  And those are all set forth clearly and agreed to in paragraph 85 of the consent decree.

Your Honor, I will briefly just touch on the defendants' other arguments.  We talked about this.  They argue that "Work," the capital W is different from the small W work.  As I pointed out, "work" under paragraph 22 is a small W and is specifically in the definition of capital W "work" under its inclusion of Section 6 of that definition.

And they also argue that the decree's dispute resolution process should be followed.  Well, it's been almost nine months since we issued our command.  They've made no offer to pay any stips and the work is still not complete, okay?

The defendants chose not to avail themselves of the dispute resolution process before the plaintiffs filed this action to enforce the consent decree.  The defendants' arguments negate the agreed-upon terms of paragraph 108.  The defendants have failed to timely invoke dispute resolution for eight months, failed to complete the work, or pay stipulated penalties pursuant to the demands and terms of the consent decree.

They also argue, Your Honor, that -- and you touched on this a little bit, that the permits in Tennessee have been formally withdrawn.  Well, after the defendants submitted their opposition brief, they formally requested that the renewal applications pending in Tennessee for permits at issue in Tennessee be withdrawn, okay?

They also argue, as we talked about a little bit, that this relates purely to paperwork issues, okay?  It should be noted, Judge, Your Honor, that the Alabama permits and the Tennessee permits would have been administratively continued without any lapse, without any stipulated penalties had the defendants timely complied.  The defendants would still be required, however, in Tennessee, at three of the sites, where the demanded work is not completed and they may still be discharging to the environment, and discharging without an NPDES permit is a violation of the Clean Water Act and a violation of this consent decree, okay?

There was some discussion they had raised in their opposition about past assessments, and that there were very few violations, and, you know, that the harm wasn't that big.  Of course, we have no measurement of the harm.  But those are not issues here in this agreed settlement.  They waived that right to trial, they agreed to these terms, there's no provision in this consent decree for weighing those factors that you would find under the Clean Water Act in 33 U.S.C.

Section 1319(d).

And I will note that they argue that the assessment by the government is arbitrary and capricious. That is not the standard. We talk about that in some great length in our response to their motion for judicial resolution, that the correct standard is provided for an interpretation of the consent decree in the -- in the consent decree in paragraph 114(b).

Your Honor, I will just say that for all the reasons we set forth in our briefs, for all the reasons I've stated here, we ask this Court to order the defendants to complete the work that's not completed in Tennessee and order the defendants to pay the stipulated penalties pursuant to paragraphs 85 within -- and within a reasonable time. We ask for ten days; whatever the Court feels is appropriate that would be fine.

Thank you, Your Honor. I'm happy to answer any more questions. If not --

THE COURT: Don't you already have the money by means of the letter of credit?

MR. CASEY: No. Your Honor, that's a good point. As a result of their failure to do the work as demanded, we actually pulled their letter -- we issued a cite draft and we withdrew the balance of their letter of credit, okay? That money was then transferred to a trustee approved in the

consent decree.  The trustee is holding that money.  But because the defendants had initiated work at the sites, we did not direct the trustee to use the money to hire contractors to actually implement the work that was needed.  And because the defendants were doing it, there was no reason to spend -- it's the defendants' money.  There was no reason to do that, so we've held in abeyance an order directing the trustee to do the work.  So that money specifically is for doing work; it is not for payment of the stipulated penalties.  If the defendants want to use some of that money to pay the stipulated penalties, we would be happy with that result.

THE COURT:  Okay.  But you're saying the Court can't simply order payment on the letter of credit for stipulated penalties?  That money has to be used to perform work; is that right?

MR. CASEY:  That's correct, Your Honor.

THE COURT:  I appreciate that clarification.  Thank you.

Does either Tennessee or Alabama have anything you way to say before I hear from the defendants?

MR. TAMBLING:  Good afternoon, Your Honor.  This is Robert Tambling with the Alabama Attorney General's Office, and I'm here today on behalf of the State of Alabama.  And I have with me today Ms. Carrie Blanton.  She's the associate general counsel for the Alabama Department of Environmental

U.S.A. v. Southern Coal - 5/14/2021

Management.

We have nothing further to add except that we fully support and adopt the argument that was made today by Mr. Casey on behalf of the States and the Environmental Protection Agency.  So we have no further remarks, Your Honor.

THE COURT:  Thank you, Mr. Tambling.

Mr. Buntin.

MR. BUNTIN:  Yes.  Good afternoon, Your Honor. Wilson Buntin with the Tennessee Attorney General's Office representing the State of Tennessee.  We also fully support the arguments made by Mr. Casey, and don't have anything additional to add.  If there's an opportunity to respond after the defendants have made their remarks, we would like to reserve that opportunity to respond, if there are any things that need to be addressed.  So thank you.

THE COURT:  Thank you, Mr. Buntin.

Let's hear from the defendants.  We have heard about an hour from the plaintiffs, maybe a little less than that, but I've also thrown questions in.

Let's hear from the defendants, please.

MR. HOUCHENS:  Good afternoon, Your Honor.  May it please the Court.  It's good to see you again today, Your Honor.

THE COURT:  I think we were just together yesterday, weren't we, Mr. Houchens?

U.S.A. v. Southern Coal - 5/14/2021

MR. HOUCHENS:  Yes, Your Honor.  Yes.

THE COURT:  It seems like we've seen each other a lot lately.

MR. HOUCHENS:  I'm like a bad penny, Your Honor, and I apologize for that.

THE COURT:  Maybe I'm the bad penny.

MR. HOUCHENS:  Your Honor, I will start by saying I was briefly involved in the *RLI* case; it took two days of my life.  So Mr. Casey's arguments by that, on that front, should be rejected as a matter of course for that punishment I had to endure.

Your Honor, regardless of that, Mr. Fowler, I'm pleased to be here with Mr. Fowler and Mr. Carey representing these defendants today, Your Honor.  And I am going to just outline the argument for the Court and turn it over to those fine gentlemen.

Mr. Fowler will address the issue of whatever the government's alleged violations in the motion to compel are included or covered by the consent decree and, therefore, subject to the stipulated penalties.  And then I believe Mr. Carey will address the defendants' motion for the Court to resolve the dispute between the parties concerning the appropriate amount of penalties, as well as any other issues that are discussed today.

And, so Your Honor, with that, it's my great

pleasure, with the Court's permission, to turn this argument over to Mr. Fowler and allow him to represent these defendants today. Thank you, Your Honor.

MR. FOWLER: Thank you, and good afternoon. May it please the Court. My name is Rob Fowler and I am co-counsel, obviously, for the defendants. And I appreciate the opportunity to appear before this Court this morning.

The issue before the Court is not whether defendants violated the Clean Water Act and it's not whether they violated their NPDES permits. As Mr. Casey stated, the government has options to pursue those violations, if they choose to do so, in an original action. Rather, the issue is whether the consent order entered by this Court in 2016 even addresses the government's alleged violations. It does not. Your Honor, this will come down to the definition just as you said, the definition of work in paragraph 63, and I'm going to address that specifically.

One other thing is, is we absolutely agree with Mr. Casey's summary of the *RLI* contract interpretation, but we believe that the government's argument ignores many of those contract interpretation rules expressed in that decision.

This issue involves a fundamental due process, Your Honor. As the Supreme Court explained in *U.S. versus Armour* at 402 U.S. 673, pages 681 through 82, and also cited by the government, it says this -- and it's an interesting case,

because it's a case that the facts actually matter. It involved a meat packing company that was accused of violating the antitrust laws, and there was a consent decree entered with the U.S. government. The consent decree prohibited the company from engaging or carrying on certain types of business activities. An unrelated business that engaged in certain of the prohibited activities later purchased controlling interest, and they were accused then of violating the consent decree.

But the issue in that case came down to the exact issue that is here, Your Honor, and that was whether or not the -- I mean whether or not a purpose, meaning what's the purpose of the consent order -- in the *Armour* case the government argued, well, the purpose was to prevent violations of the antitrust act, just like here the government is trying to argue that the purpose of the consent decree is to prevent violations of the Clean Water Act or the NPDES permit. And we're going to submit that that's not the case.

And let me read to you, if I might, a little bit of a quote, because I think it's great language from the United States Supreme Court directly on point. And it says this: "Thus, the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much as that imposing purposes as the respective parties have the

bargaining power and skill to achieve.  For these reasons, the scope of the consent decree must be discerned within its four corners, and not by reference to what may satisfy the purposes of one of the parties to it."

"Because the defendant has, by the decree, waived the right to litigate the issues, a right guaranteed by the due process clause, the conditions upon which he has given that waiver must be respected and the instrument must be construed as it is written."

Your Honor, the Supreme Court has spoken on this issue, and I think that as we walk through -- I'm like you.  I think that we're going to look at -- we're going to look at four paragraphs, and, frankly, each of those paragraphs there's a total of five sentences.  That's how easy this decision is going to be in my mind.  You look at the five sentences, you see if there's an obligation; if it's not there, the Court should not then look at the purposes, whether or not, you know, the purpose was to require compliance with the Clean Water Act.

The government only identified four short paragraphs of the decree that it asserts to establish the obligations for which the government claims defendants violate.  I'm going to walk through those paragraphs, but first let me do this, because I think it goes directly at what Your Honor said early on, and that was, isn't it going to come down to the

definition of 63?  And let me tell you why it is, and this is actually a pretty important fact.

Even if the government finds that -- even if this Court finds that the interpretation of the government is correct and that the key definition in 63 of "work" is correct and somehow the decree contains an obligation for the defendants to comply with this NPDES permits, the government still would be entitled to a total of $3,000 in stipulated penalties.

Let me tell you why, Your Honor.  The government alleges three types of violations here.  The first one is, is that the defendants failed to timely file its NPDES permit renewal applications.  Well, Your Honor, the government and Mr. Casey were correct that it, if true, would be a violation of an NPDES permit.  That is a NPDES permit violation that would be covered if you accept their definition of paragraph 63.

However, the next two violations are critical here, Your Honor.  If you look at them, the second one is this: Defendants operated facilities with lapsed and expired permits.  Your Honor, you know what that means?  It means there are no permits to violate.  Those violations are Clean Water Act violations.  And, in fact, $3,168,000 are for violations of the Clean Water Act.  So that the only way the government can win now and win this argument is if that

definition somehow said a complete violation of -- it's going to cover all violations of the Clean Water Act.

The second -- I mean, the third violation that they allege was unpermitted discharges.  Well, the word "unpermitted" tells that you it is not a violation of --

Yes, Your Honor?  Okay.  I thought someone spoke.  Sorry about that.

But the word unpermitted tells the Court that it is not a violation of an NPDES permit.  You can't violate a permit that has expired.  It is a Clean Water Act violation.  So that's going to come back to the *Armour* case of the Supreme Court where it says unless there is something that says you shall not violate the Clean Water Act, it's exactly -- it falls exactly in line with the *Armour* case.

So if this Court accepts the government's argument that the definition of paragraph 63 imposes NPDES permit compliance obligation, again it only addresses the one type of violation, which is a total of $3,000, and that would be the most the government would be entitled to.

You know, a telling question on this is how many --

THE COURT:  But what about --

MR. FOWLER:  Yes, Your Honor.

THE COURT:  What about the aspect of paragraph 63 where it says, "In taking all necessary additional actions to comply with the defendants' NPDES permits for the term of the

consent decree?" So they got these permits, they don't take actions to renew them, so the permits lapse. Doesn't that fall squarely within the term of paragraph 63?

MR. FOWLER: Your Honor, I agree with your comment that you made earlier, and that was this is an absolutely circular way -- they're trying to say look at --

THE COURT: No, no, no, no. Hold on a second. When I was talking about circular, I was talking about the use of the word -- the reference back of Section 6 back to paragraph 22.

I'm talking about the second part of paragraph 63 where it says, "In taking all necessary actions to comply with the defendants' NPDES permits for the term of the consent decree." So at the time of the consent decree, if they've got permits for these places and then they let the permits lapse or they don't apply for renewals, that seems to me to fall squarely within the second part of paragraph 63, doesn't it?

MR. FOWLER: Your Honor, I would argue a couple things here, and that is, is that you have to look at the entire definition here. Let's read that definition, if we will. In fact, Your Honor, if I could, if you would allow me I would like to pull that up so that everybody can see the simple definitions here. It's taken directly from the consent decree, if it's okay with Your Honor.

THE COURT: That's fine with me.

MR. FOWLER:  If somebody will give me permission, I'll pull that up for you.

THE COURT:  Kristin, can you allow Mr. Fowler to share the screen?

THE CLERK:  I did.  He should be able to do that.

MR. FOWLER:  Your Honor, I'm going to go down to paragraph 63, and let's talk about what exactly paragraph 63 does, because I think you have to read it in its entire context.  If you look at the plain language of paragraph 63, it states that the definition of a work -- and by the way, this is something that also wasn't discussed.  Look at the very first sentence of the definition.  It says, "For purposes of this section."  Your Honor, this section is the financial assurance section of the consent decree, which means that this section should only apply to that.

Now, if you go down to the question that you posed for us, and that was, doesn't the second part of that mean something?  Well, if you read -- as we read the definition, Your Honor, it says, and I have to go back up because it's part of the argument, "For purposes of this section, the 'Work' is defined as Section 6, Section 7, Section 9 of this consent decree."  And then it says, "And taking all necessary actions to comply with defendant's NPDES permits."

Your Honor, it is separated -- it's completely separated out here from the consent decree.  The definition

itself even shows that it's something in addition to. It uses the word "addition" to the consent decree. It's not included in the consent decree for purposes of the word "work."

I guess my second answer to that, Your Honor, is the government is trying here to impose an obligation through a definition that doesn't say, "Defendants shall comply with Clean Water Act" or "Defendants shall comply with their NPDES permit." So I would argue that this is simply a definition, it is not a commandment to do anything under the consent decree, and it simply doesn't address that issue. So even though you plug that back in -- and I'll get to the word "work" here in a second when we talk about the other sections, Your Honor, where I think you'll see how the word "work" works with the other two sections that we'll take a look at.

Your Honor, as we talk about -- and I say that we've just gone through and said why the government would only be entitled to a very specific limited $3,000, because even if the government is correct and it does apply to NPDES permits, so assume they're correct there and that definition does say and to comply with the NPDES permits, it doesn't say to comply with the Clean Water Act. And those are very different.

And in 2016, when the defendants sat down with the government, we bargained for something and we wrote it down in the agreement. We can't look and say, "Well, the purpose of this now is something different from that," because that's not

what the Supreme Court tells us to do.

THE COURT:  Yeah, but in 2016, if you've got permits for these locations and then you don't continue those permits, doesn't that constitute a violation of paragraph 63 where it says, "and taking all necessary additional actions to comply with the permits"?  I mean, if you've got permits in 2016 and you don't renew them and you discharge into the waters, doesn't that violate the terms of this consent decree?

MR. FOWLER:  Your Honor, I would respectfully say it doesn't, and the reason is this --

THE COURT:  Tell me why, and tell me why you say that.

MR. FOWLER:  Yes, Your Honor.  The reason is, is because the discharges that you're talking about under an NPDES permit, if an NPDES permit says -- it allows you, as Mr. Casey said, it allows you to discharge certain pollutants. And in the consent decree there are a lot of things that it did.  In fact, it specifically says that there is a part of an NPDES permit that we are going to regulate.  It regulates specifically effluent violations.  So if there is effluent violations, then guess what, there are stipulated penalties due.  And, in fact, defendants have paid some stipulated penalties under that provision.

But just because they agreed to parts of the Clean Water Act saying "compliance with your NPDES permit" doesn't

U.S.A. v. Southern Coal - 5/14/2021

mean that they agreed to say, "We are going the waive our due process rights so that we can't present our argument in court."  The government has a remedy here, Your Honor; it's to file an original action under the Clean Water Act either with the States or the EPA.  So we're not asking for our client to go scot-free.  There's simply a remedy.  And the government has chosen a remedy here, trying to shoehorn in a violation that simply doesn't fit within this consent decree, Your Honor.

Your Honor, if I might, I'm going to scroll back up to the other two paragraphs.  As I mentioned before, we believe that there are a total of four paragraphs that are relevant and easy to look at to determine whether or not there's a requirement here.  The first one is paragraph 22 and paragraph 29.

The Fourth Circuit has established a standard also of interpreting contracts when it says you should look at the plain meaning, and that was already provided to this Court.  And I say "provided in this Court."  The *RLI* decision actually followed that precedent.  But the Fourth Circuit in *Central Telephone Company of Virginia versus Sprint of Virginia* at 715 F.3d 501, page 517, it says that we interpret contracts as written, and when its terms are ambiguous we construe the contract according to its plain meaning.  So even the Fourth Circuit said exactly what Mr. Casey says.  We agree with that.

But now let's look at the plain language.

THE COURT:  I just want to say, Mr. Fowler, each side citing the *RLI* decision, that is now on appeal at the Fourth Circuit, so we'll see what they have to say about what I said.

MR. CASEY:  I'm sure it will be affirmed, Your Honor.

THE COURT:  I don't know.

MR. FOWLER:  And we agree with that decision.

THE COURT:  That case was hard and it hurt my head.

Go ahead.

MR. FOWLER:  Yes, Your Honor.  Let's look, now that we all agree, and Mr. Casey agrees as well that we should look at the plain language, let's look at the plain language of this.  Frankly, all four of these paragraphs are a total of five sentences, Your Honor, five relevant sentences that apply here.

The language, let's look at the language in paragraph 22 first.  That language says this:  "Work required by this decree," okay?  And that indicates -- it says, "Defendant shall perform the work required by this decree."  In and of itself, that is not a mandate.  That is not a mandate for anything.  That is telling the reader to look somewhere else in this consent decree for an obligation to perform the work.

Now, the government, and I'll get back to definition of 63 in a second, the government's answer here is, is that the word "work" as defined in 63 is that obligation.  I would

say -- and that's why the word "work" -- and I told you that definition is going to be critical. I will get back to that in a second.

But also, if you look at paragraph 29, it has the same issue with it. And paragraph 29, the plain language, it states that absent some obligation elsewhere in the decree, these paragraphs standing alone require the defendants to do nothing. Defendant shall perform the work required by the consent decree. What work? We've got to define where that work is.

Paragraph 29, "where any compliance obligation under the decree requires the defendant to obtain a permit." So there's got to be some compliance obligation under the decree somewhere else. The government needs to show us where that somewhere else is because it simply does not exist, Your Honor.

Now, if you go down, the government attempts to argue, and I say this, and I say -- in their briefs the government attempts to argue, "Well, the NPDES permits are part of what's covered here. And when it says that we've got to comply with the law, we didn't comply with the law." Your Honor, that is the absolute wrong reading for both of these.

If you look at this, and let's start with paragraph 22. It says, "Defendant shall perform the work required by the consent decree in compliance with the requirements of

applicable federal, state law." So it says, you have to comply with the federal law when you're doing work as required by the consent decree. The NPDES permits are not required by the consent decree, and I'll get to that when we get back to 63, but they're not required by the consent decree. Compliance with the Clean Water Act is surely not -- it surely doesn't meet that definition.

If you look at these two definitions, I would challenge anyone to say where there's a requirement standing alone. And I think the test is this, Your Honor: If you look at these and these were the only two paragraphs in this consent decree, and I know they are not, but if they were the only two paragraphs in this consent decree, what must the defendants do? The answer is, is nothing. They require absolutely nothing by the plain language. It's just simply not there, Your Honor.

Finally, let me give you a couple of examples, because I think this is really big on how and what these two paragraphs actually mean. You know, these paragraphs are contained in numerous Clean Water Act -- numerous Clean Water Act consent orders word for word oftentimes. These are boilerplate languages, and let me tell you what it means. Paragraph 22 -- what paragraph 22 means, and let me give you an example how it applies, the financial assurance section of -- frankly, in paragraph 65 of the decree, requires the

defendant to provide the government with a fully-executed standby trust.  In providing that trust, paragraph 22 then would require the defendants to follow the laws of drafting, executing, and whatever the law of trust is, they have to follow the law to provide a proper trust for that.  It is not an NPDES permit.

And, frankly, think about this:  How can, when it says "required by this decree," how can these NPDES permits be required by the consent decree when they were issued before the consent decree was entered?  These paragraphs simply do not apply to what the government is trying to apply them to.

Now let's use the example on paragraph 29 so that we can give meaning to it as well; and that's talking about permits.  And the government, in several of their briefs, have quoted this section saying that, "You shall timely complete applications," but they're trying to apply that to the NPDES permits.  The language here is plain, where any compliance obligation under this decree requires the defendant to obtain the permit, then they must timely submit that.  The compliance -- the consent decree didn't require the NPDES permits that we're talking about.  We had those before the consent decree was issued.  So standing alone, these simply cannot do what the government is telling you they could do.

Now let me give you that example I was telling you about for paragraph 22 permits.  If the consent decree had a

requirement that defendants construct a sediment pond and a new discharge point from the pond, that pond would be a compliance obligation under the consent decree.  And then it would be covered by paragraph 29, and they would be obligated to make sure that they got the permits for the construction of that required pond.  They would have to go out and get building permits locally.  They may have to get a local storm water permit.  But that's what this language means.

And, in fact, in a second we'll talk about other consent decrees real quick where this language is included exactly.  But you know what, Your Honor?  When this language is included in other consent decrees -- and I think the Court can take judicial notice if it wants to of these decrees in a little bit.  I'm not asking the Court to do that.  But I think that they can look at them because they're judicial determinations and they're on EPA's website.

But if you look at those decrees, Your Honor, I think what you'll see is paragraph 22 is quoted exactly many times. 29 is quoted very closely many times.  But you know what those decrees have, Your Honor?  Most of them, and I will show you some if you like, most of them will have a requirement above these paragraphs or below these paragraphs that say this: Defendant shall comply with the Clean Water Act.  Defendant shall comply with their NPDES permits.  That is the obligation that 23 -- where the government is trying to make 23 apply to.

U.S.A. v. Southern Coal - 5/14/2021

But that's where the obligation is in other consent decrees.

Next, Your Honor, I would go now, if we could, I would like to go down and start talking about what you said was the big issue, and that was the definitions.

Let's take a look at these two definitions quickly, and then I think it will help with the discussion.  "Work." "Work" is defined in 14(ee).  And what can we glean from this real short sentence?  Well, number one, we notice that the W is capitalized; it is a defined term.  That means something, and we'll talk about that.

It also describes -- I think it's interesting because it describes the items under this definition as actions.  It doesn't call them obligations.  It doesn't call them requirements.  It doesn't call them anything to do with compliant.  It says these are simply actions.  I think that that's somewhat telling.

Finally, the third thing I think we can glean from this definition, at least this section, is that all of the defined terms are capitalized, and all of the defined terms, when they're used throughout the document, are used consistently.  And in a second you'll see where the Fourth Circuit has said that's what we ought to look at.

Now let's look at paragraph 63.  Again I'm going to point out that the plain language of 63 states that the definition of "work" only applies to the Financial Assurance

Section.  If you read these requirements, you know what that's doing?  It's telling the trustee, it's telling everyone that's implementing the Financial Assurance Section how they're to implement it and what they're going to have to do and where they're going to have to spend their money.  They're going to have to do it by implementing Section 6, the general compliance requirements.  They're going to have to use that money, if they call upon them, to complete the injunctive relief, and they're going to have to use it for reporting requirements of this consent decree.

But then you have to look at the rest of the language, "and taking additional actions to comply with the defendants' NPDES permit."  Again, Your Honor, "additional action" implies something above and beyond the consent decree.  It is -- because it's stuck here in the definition in the Financial Assurance Section, it's not even included -- it's not included in the general compliance requirements.

Your Honor, I think you hit the head on the nail (sic) when you talked about the word "W."  Let's discuss this, because I've got a case I would like to share with the Court.  The word "W" in the word "work" in paragraphs 14(ee) is capitalized.  The word "work" in paragraph 22 is a small W, therefore indicating that it does not have the same meaning as the defined term.

In an unpublished opinion -- and I say that means it

is not to be used as precedence but it is still very persuasive and directly on point in the Fourth Circuit.  The case is *Environmental Production (sic) Corporation versus King Companies, Inc.*, 47 F.3d 1164.  The Westlaw cite to it, Your Honor, is 1995 WL81740.  It's the Fourth Circuit in 1995.

That case involved a contract dispute and the contractual definition of a term was implicated in the instance where the term also appeared in lower case and capital case.  The Fourth Circuit found that the contractual definition was not implicated and provided a road map for how this Court could address this issue.

And here's what they said:  In addressing the issue, you basically ought to look at two things.  The first one is whether the term is consistently capitalized.  Okay?  The second one is, is look at the context, is it always used and does it make sense when you apply that definition to every term within the document?

Well, you know what, Your Honor, if you take a look at the word "work," it's a capitalized 100 percent of the time when it is addressing financial assurance matters; 100 percent of the time it is capitalized.  And guess what.  It's capitalized -- it's not capitalized 100 percent of the time when it's talking about anything other than financial assurance.  That's telling you that the language at the beginning of the definition that says for purposes of this

section it matters.  It matters because it's the way the contract -- the consent decree works.

Now, let's also look at, say, applying the definition.  And I say this, it's interesting because there are some other instances where the word "work" is used in the consent decree.  I will point the Court to a simple one and that is paragraph 32a.  In paragraph 32a, it discusses the qualifications of consultants.  And in 32a, the word "work" is there and says something along the lines you've got to see if the consultant has work experience.

Well, let's now apply how absurd that really is if you apply this definition to that.  Well, they can't have work experience with Sections 6, general compliance requirements of the consent decree.  They can't have work experience with injunctive relief of the consent decree.  They can't have experience for reporting and requirements.

So the word is used -- if they're going to apply that to all the words, then all of a sudden you've thrown this consent decree every time the word "work" is used into complete havoc.  That's why the word "work" cannot, cannot be applied with a small "W."  It is not a defined term, Your Honor.

Now let's go and take a look at one other -- another section.  And I told you I was going to limit you to these sections.  But if the Court would look at paragraph 33a of

Section -- the same section, of Section 6, 33a and b.  That is a section discussing -- and it's in the general compliance section, so it's in the same section as paragraph 22 and 29. But what's interesting is, is that the section is entitled "Implementation of Consent Decree Requirements At Future Facilities."  Okay.  The purpose of this section was to say if the defendants acquire a new facility, then those facilities are going to fall under this consent decree, and we want you to adhere to the same requirements as this consent decree for those facilities.

And, in fact, it goes on and it recognizes that there are several things.  It requires -- it gives time frames and it extends the time frame, because as soon as you buy a facility, you can't come into compliance, so it says, "We're going to give you more time."  In fact, it talks about outlet inspections, it talks about establishment of a compliance database, it talks about electronic notification violations, effluent limit, and failure to sample violations, timing of audits, report and trainings.

But you know what's not in here, Your Honor?  The word "work."  The word "work."  What else is not in here is compliance with the Clean Water Act.  What else is not in here is you must comply with the NPDES permit.  It's just simply not there.

Your Honor, we believe, and this is -- we believe, as

I said before, that this Court can take judicial notice of prior consent orders. And I believe Mr. Casey mentioned one at the beginning of his -- when he was talking about a consent order in the big case that you guys don't like. And we believe that the Court could -- and if I might, and I say this: I would like to pull up just three examples of consent orders so I can show you how the language works and how it's very different from the language in ours. May I share that, Your Honor?

THE COURT: Go ahead.

MR. FOWLER: Okay. Thank you, Your Honor.

THE COURT: I didn't say I didn't like the *RLI* case. Wait a minute, Mr. Fowler, I didn't say I didn't like the *RLI* case. I simply said that it was hard and it hurt my head.

MR. FOWLER: For me, that would mean I didn't like it, so I must have read too much into that, Your Honor.

Let's take a look at three quick cases that the EPA, and it was involved in the DOJ. The first one is *United States versus CONSOL Energy*. And I think that there's a capability of copying this, but if you would like, I can read the cite for you. It's Case Number 2:16CV01178-NBF at paragraph 19. And it's in the Western District of Pennsylvania, and I'm just using this as an example to show you.

It contains the exact language of paragraph 22. But

U.S.A. v. Southern Coal - 5/14/2021

what's interesting, it also contains an obligation in that same section that says this:  "Defendants shall operate the mining facilities associated with the Bailey Mine Complex to ensure compliance with its NPDES permits."  That's the obligation that is missing in paragraph 22, 29, and the obscured definition that they're trying to apply from the Financial Assurance Section.

Likewise, the *United States versus EMD Millipore Corporation*, Case Number 1:17CV00034, at paragraph 12.  It's in the District of New Hampshire.  On January 3rd, 2017, is when the consent order was entered.  It contains the exact language of paragraph 22's first sentence regarding work, an almost identical paragraph to paragraph 29.  However, it also includes an obligation.  It says in the Obligation Section, "At all times, defendant shall operate the facilities to achieve compliance with all applicable federal, state environmental laws."  "Environmental laws."  I'll stop there.

You go to the next case, *United States versus D.G. Yuengling and Son, Inc.*, Case Number 3:16-CV-01252-MEM, at paragraph 10, in the Middle District of Pennsylvania in 2016. It contains a paragraph -- it contains the exact paragraph as paragraph 22 that uses the word "work," and it is simply boilerplate language.  But, again, in that bargain that the defense bargained with EPA, EPA managed to get this language in there.  And it says:  At all times defendants shall operate

U.S.A. v. Southern Coal - 5/14/2021

the facilities to achieve compliance with all applicable federal and state environmental laws, including, without limitation, the Clean Water Act, applicable National Pollutant" -- NPDES permits and IU permits and other permits. This is the example -- and the government knows how to do this.  They know how to write in there "Defendants shall comply with the Clean Water Act."  They know how to say "Defendants shall comply with the NPDES permit requires -- requirements of the NPDES permit."

You know, as we're looking at this, it reminds me, Your Honor, and I'm wrapping up here, it reminds me of a quote from Justice Scalia, and I'm not just saying this lightly because it really does.  Justice Scalia said in *Whitman versus Am. Trucking Association*, at 531 U.S. 475, at page 468 in 2001, and here's what he said, and it's a pretty famous quote -- I think I heard this in law school many, many years ago.  Well, actually, I was out of law school so it was right after that.  And it says this:  It says that, "Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions.  It does not, one might say, hide elephants in mouseholes."

The government's here attempt to collect $3,192,000 in stipulated penalties is the elephant hidden in the mousehole of paragraph 63's very vague and ancillary definition of work.  As such, Your Honor, if you pull up all

four of those paragraphs together, you're not going to find a single obligation. You're not going to find it, Your Honor, and as such, we respectfully request that this Court find that the government's alleged violations are not, in fact, violations of the consent decree and deny the government's motion to compel.

If the Court agrees with us on this, it need not address the dispute resolution issue or whether a decrease in penalties is justified. Those issues and whether or not the defendant has to pay for what it did can be decided in a separate action. I'm open for questions, Your Honor.

THE COURT: I have two, two -- I have two requests of you, Mr. Fowler. One, can you file your PowerPoint, your screen share as an exhibit for this hearing so I have these three cases cited and it's in the record? Can you do that?

MR. FOWLER: Absolutely, Your Honor. I'll do that today.

THE COURT: And the second thing I'd like you to do, I must have written the case cite down -- I was trying to pull it up on Westlaw while you were talking. For the Fourth Circuit case that talked about capitalization, can you give me that cite again.

MR. FOWLER: Yes, Your Honor. Let me pull that up real quick here.

THE COURT: You said it was unpublished.

U.S.A. v. Southern Coal - 5/14/2021

MR. FOWLER:  It was and is.  I'm trying to find it right here in my notes, Your Honor.  I've got it right here, and that is, it is 47 F.3d 1164.  And then it's 1995 WL81740, and it's the Fourth Circuit in 1995.

THE COURT:  81740.  Okay.  Hold on a second.  The 47 F.3d 1164 is not right.  That's plainly not right because an unpublished decision doesn't get in F.3d.  But I found it at the Westlaw cite.  I got that case, so thank you for that.  I just wrote the number down wrong.  That's helpful to me.

All right, Mr. Fowler.  Thank you.

Does Mr. Carey have something he would like to say?

MR. CAREY:  Your Honor, at my advanced age, I'm technically challenged sometimes to work the mouse appropriately.

Pat, you're on my screen.  Can you mute yours so you go off the screen?

MR. CASEY:  Just a second.  You want me to --

MR. CAREY:  If you would mute.  For some reason it's got you -- I'm not seeing -- well, I'm seeing the Judge up at the top.

Regardless, my presentation, Your Honor, is only relevant if the Court were to determine that the consent decree does contemplate the violations that they have assessed in this matter, and the Court believes that the government has the power to order stipulated penalties.  And in that regard,

we have moved the Court to resolve a dispute between the parties concerning the appropriate amount of the penalties. And it's our position that the penalties assessed by the government are grossly disproportionate to the total lack of harm to the agencies and the environment, caused by defendant's failure to timely renew the permits and should be substantially reduced.

Now, the defendants -- I'm sorry, the plaintiffs assert that because the defendants had not submitted to the plaintiffs a written notice of dispute invoking the dispute resolution process at the time they filed their motion, that we're barred from raising any defense under paragraph 108. However, what they importantly leave out is that the consent decree --

THE COURT: Mr. Carey, could I stop you there for one second?

I do not see any of the counsel for the states or for the EPA or the -- I'm sorry, the Justice Department. I don't know if they're still with us and they just went off on -- I just want to make sure we didn't lose anybody.

Oh, I see those folks from Alabama and Tennessee now. I just wanted to make sure. Sometimes -- and I see Mr. Casey. Sometimes folks go away and we have to redial them in and it's a real pain. I just wanted to make sure that y'all are still with us.

Go ahead, Mr. Carey.

MR. CAREY:  Thank you, Your Honor.

Importantly what the defendants -- the plaintiffs fail to recognize, however, is the consent decree does not have a deadline for invoking the dispute resolution process. To the contrary, paragraph 109 of the CDD states that a dispute is considered to have arisen with when the defendants send the plaintiffs a written notice of dispute.  That was done on March 17th, 2021, in which he laid out argument contesting the amount of the penalties.  After we received no response in 30 days, we then filed a formal notice of dispute on April the 20th, 2021, further outlining our position.

The plaintiffs then filed a response to our formal notice of dispute on April the 30th.

THE COURT:  Hold on one second, Mr. Casey -- Mr. Carey.  I'm sorry.

MR. CAREY:  That's no problem.

THE COURT:  I'm sorry, Mr. Carey.  Please go ahead.

MR. CAREY:  Your Honor, after the plaintiffs actually filed a response to our formal notice on April 30th, 2021, under paragraph 112 of the consent decree the issue then became ripe for judicial resolution.  And that was the basis of our motion on May 4th of this year, moving the Court to actually resolve the dispute.

Now, it is our position that the standard of review

is arbitrary and capricious under paragraph 114a of the CDD. However, the plaintiffs assert that it's actually 114b, which involves resolution of, quote, "interpretations of the CD." That's not what we're doing here.  We're not asking you to interpret the stipulated penalties.  We believe that they're excessive and should be reduced and that's the proper standard of review.

Now, even if this Court were to determine that it was somehow our obligation to anticipate that they would file this motion to compel -- and when I say "anticipate," I say that because they never told us in the entire seven months that we had had ongoing discussions concerning the amount of the stipulated penalties.  Many discussions, letters were exchanged, we were completely engaged in ongoing discussions, and then they filed it without warning.

Now, if the Court determines that we should have somehow anticipated that and invoked the -- filed the formal -- or the informal notice sooner, there's still a basis under the case law that the Court can consider this, and that's the *Witco* case that we cite in our brief, Your Honor.

And in *Witco*, there was an EPA consent decree with a manufacturer whereby the defendant agreed to clean up a contaminated site and to pay the EPA oversight costs associated with that cleanup.  The EPA sent a demand for costs of $205,000 to the company, and under the terms of that

consent decree the dispute resolution process required the defendant to contest by sending a notice of dispute within ten days. It didn't do so. It waited 55 days until after the demand to file a notice of dispute.

The defendant in that case then filed a motion with the district court to eliminate the oversight cost due to a change in law. The EPA then sent a notice to the defendant that -- of stipulated penalties that accrued for failure to pay the oversight cost. Those stipulated costs rose to $1.2 million.

When it went to hearing, the EPA asserted, just as here, that the defendant was barred from objecting to the payment of cleanup costs because it had failed to timely invoke the dispute resolution process. Now, the judge in that case said by failing to timely invoke it was a breach of the consent decree. However, the EPA cannot demonstrate that it was prejudiced in any way by the delay, and thus, the breach was not material and the Court went on to say that it would consider the motion on its merits.

Now, the Court also had some interesting holdings in relation to the stipulated penalties themselves, and that is the Court found that the $1.2 million in stipulated penalties for failure to timely pay the oversight cost, that neither the EPA nor the environment are being harmed by Witco's delay in paying the oversight costs.

And in reviewing the stipulated penalties, the court chose to review it under a reasonableness standard; that is, are the penalties reasonable. And the court held that, "The penalties sought by the EPA bear no relation to the degree of harm caused by Witco in contesting the liability to pay oversight response costs. As noted above, neither the EPA nor the environment are being harmed by Witco's pursuit of its legal claims," and, therefore, the court struck that provision --

THE COURT: But does that constitute a court rewriting the contract for the parties?

MR. CAREY: It found that it was void because it arbitrarily, if you will, and I'm not using that in the legal sense, because it arbitrarily allowed the stipulated penalties to accrue while it was on -- before the court, in the breast of the court.

The point is, it applied a reasonable standard. I'm not asking you to void the stipulated penalty clause; I'm not asking for that relief. What I'm asking you to do is either under an arbitrary and capricious standard or a reasonableness standard find that because there is completely no harm to the agencies or the environment for the defendants' failure to timely renew the permit, that a penalty of 3.2 million is grossly disproportionate and should be renewed.

Now, that brings me to getting into the weeds a

little bit.  And I beg the Court's indulgence, but I'll try to get through this pretty quickly.  In terms of the underlying facts, both in Alabama and Tennessee --

THE CLERK:  Judge, Judy has an issue.

THE COURT:  Judy.

THE COURT REPORTER:  I'm sorry, Your Honor.  I am going to run out of charge.  I need just a minute to get a charger.

THE COURT:  We will stand in recess for five minutes.

(Recess taken from 2:22 p.m. until 2:28 p.m.)

THE COURT:  It looks like we've got -- I don't know whether Mr. Casey is with us or not.  He is.  Okay.

Let's go ahead.  Mr. Carey, where you were was you were arguing that there was no harm to the agencies or the environment from the failure to timely renew the permits, and, therefore, applying either a reasonable standard or arbitrary and capricious standard, the amount of penalties sought are grossly exaggerated.  I think that's where you were when we broke.

MR. CAREY:  That's correct, Your Honor.  And what I want to do now is address both the underlying facts in both Alabama and Tennessee to further demonstrate that point.

In Alabama the government has assessed total penalties of $1,933,500.  Now, all but 2,000 of that relate to one permit, and that's what I call the Poore Kirby permit.

U.S.A. v. Southern Coal - 5/14/2021

The Poore Kirby permit was issued in May of 2014, and at that time there had been no mining under that permit since 2012, and the grading and vegetation work that was required was completed in 2014.

On March the 6th of 2019, the company submitted its first renewal application for the permit 70 days before expiration, but not 180 days, as pointed out by the government.

THE COURT:  I'm sorry.  Can you give me that date again, please?

MR. CAREY:  Yes, Your Honor, March the 6th 2019.

THE COURT:  Thank you.  Go ahead.

MR. CAREY:  On April the 17th, 2019, ADEM, the regulatory agency, issued an NOV advising the company that its permit application was late and that they needed to submit a complete application.  On May 10th, a second renewal application was filed.  And then on May 15th, the permit expired.

Then on July the 26th, 2019, a third application was filed, this time by an outside contractor, Task Engineering. And as part of that application in response to the NOV, they had to provide what's called a Cost Avoidance Analysis analyzing whether the company saved money by filing its permit late, and the conclusion was there was no financial benefit to the company for doing so.

U.S.A. v. Southern Coal - 5/14/2021

Importantly, on December 4th, 2019, ADEM sent a letter stating that the third application meets the intent of the NOV.  Thereby, we understand that to mean that it was a complete application under the requirements of the regulations.  However, on March the 23rd, 2020, ADEM wrote a letter stating that the permit was going to be denied because Poore Kirby did not have a mining permit.  But the company objected, saying, "We haven't been mining coal since 2012.  We don't need a mining permit."

Now, ultimately, ADEM changed its mind and on January the 13th, 2021, issued the new permit with very little changes.  And a summary of those changes can be found in the record, Your Honor, and I'll just give you the docket entry. It's docket Number 42-1, page 2887.

Now, it's notable that, under the consent decree, when stipulated payments are made to the states and the federal government, in every state and the federal government but Alabama, those payments are made to the general treasury, but according to the consent decree, they're paid to ADEM.

It's our position that ADEM made a mistake in the application of the law.  They mistakenly believed a mining permit was required when it wasn't, and that because of that mistake, the amount of time required to renew it was extended. And I believe the government has recognized this, because Mr. Casey has related this in his response filed just this

week, and otherwise I wouldn't have mentioned it, but he did offer to reduce the stipulated penalty to 180 days past the complete -- past the renewal application filed on July 26th, subject to ADEM's approval.  So we believe that the very starting point for the penalty should be simply that period of time, which amounts to about a million dollars.  However, we believe that the penalty should be further reduced because there's no resulting -- there's no harm as a result of the delay.

Now, if you would look -- I don't know if the Court has the docket in front of you, but I can certainly adequately describe it.  I'm not as sophisticated as Mr. Fowler.  But if you look at in the docket, it's --

THE COURT:  I have it pulled up, so go ahead.

MR. CAREY:  26-4, page 26 -- I mean, it's docket Number 26-4, page 2655.  It's a chart that looks like this.

THE COURT:  2655?

MR. CAREY:  55, Your Honor.

THE COURT:  I've got it.  It's right after some pictures.

MR. CAREY:  Yeah, exactly.

THE COURT:  I got it.

MR. CAREY:  Now, this is the chart of stipulated penalties that the government has assessed for -- in relation to the Alabama permits.  The first three entries are for

U.S.A. v. Southern Coal - 5/14/2021

failure to submit a timely application, and it's for each of the three permits, for a total of $3,000.

The fourth column down you will see is for a lapse in coverage, lapse in permit coverage for the Poore Kirby Mine, and then proceeds to assess a daily penalty for that period of time from May 16th, 2019, through July 31st, 2020, which amounts to $1,912,000.

The next 18 violations, Your Honor, are for discharges without a permit. And there are 18 of them, all at the Poore Kirby Mine. So these are the ones where there's actually a discharge in violation of the permit. The others are simply for failure to have a permit in place.

And if you look at that, that means that a discharge without a permit is only .9 percent of the total penalty. The important part of it is, though, Your Honor, even though the permit lapsed, the defendants have continued to sample the water and there have been no violations either under the old permit or under the new permit. And, in fact, if you look at the history of the permit, since 2016 when the CD went into place, there are basically two outlets.

There are only two outlets that require sampling, but only one of those has any flow, and so we're talking about one outlet that discharges water. And in the entire history of the consent decree, since it was lodged in 2016, there have only been two violations under that permit and they were both

in 2017; one for thallium, which we paid a $1,500 penalty, and for one pH, for which no penalty was paid because it was corrected within 72 hours.

So we suggest, Your Honor, that it is quite arbitrary and capricious to assess a penalty of $1.9 million where there's no environmental harm. There's only one outlet that discharges water and virtually almost 100 percent compliant.

THE COURT: You say since the consent decree has been in place there are only two outlets and only one has flow?

MR. TAMBLING: Right. And that's not the record, Your Honor. I apologize for that. I just learned that this week.

THE COURT: Can you identify which ones those are?

MR. CAREY: Your Honor, I can give -- I'm not sure which -- I will have that looked for while I continue, Your Honor, and I'll get you the outlet that has flow, okay? I can have that --

THE COURT: Write the name of the two outlets and the outlets that have flow. If you don't get it to me today, you can file it in a supplemental filing.

MR. CAREY: I appreciate it, Your Honor. I can get you an affidavit from the company official so it's coming from the company.

THE COURT: That would be great.

MR. CAREY: So that's what we have in Alabama.

U.S.A. v. Southern Coal - 5/14/2021

Now let's turn to Tennessee.  In Tennessee, the penalties assessed relate to the failure to timely renew three permits.  But, again, importantly, there has been no mining under these permits since 2013.

On May the 6th of 2020, the permits expired and renewal applications were filed.  On September the 2nd, 2020, a notice of default was sent by the government for failure to timely renew 11 permits in Tennessee and assessed stipulated penalties for three permits.

19 days later, on September 21, 2020, TDEC, the regulatory agency, sent a letter to the company stating that of the 11 permits that have expired, eight sites are stable and require no permits.  It went on to say that work is needed -- grading and vegetation is needed at three sites, and advised the defendants that they should proceed to withdraw the renewal applications for the permits because the permits will no longer be needed.  A mere 19 days after the penalties were assessed, TDEC, the regulatory agency, said, "You can go ahead and withdraw your application for the permits."

Now, Mr. Casey mentioned that we waited until April 7th of 2021 to officially withdraw them, and that's true because there was also the need to coordinate with the Office of Surface Mining because the bonds are still in place on these sites, and we had to coordinate with them about the actions that needed to be taken.  And the resolution was we

would go ahead and withdraw the NPDES permits, and if there's any disturbance on the property, then we'll substitute storm water permits.  So, again, 19 days after the assessment of penalties we're told to withdraw our penalties -- I'm sorry, our applications.

So let's look at the penalties.  It's Docket 26-4 page 2651, Your Honor.

THE COURT:  I've got it.

MR. CAREY:  You got it?  If you'll look at it, first of all, there is no penalty assessed for failure to timely renew the applications.  But the next three are for, quote, lapse in permit coverage for each of the three permits.  You see, it's Refuse Area Number 2, Mine 5A and Mine 20.  And each of those assess a daily penalty from May the 6th, 2020, through August 25th, 2020.  That's a total of 111 days, amounting to a penalty for each permit of $418,500.

They then cite us for three discharges, subsequent to the lapse of the permit, for discharge without a permit, one for each site of $1,000.

So if you look at that, that means that only .2 percent of the penalty relates to a discharge without a penalty -- I'm sorry, a discharge without a permit. 99.8 percent simply is the failure to have permit in place.

But, again, let's look at the history of these permits.  There's a total of eight outlets, and I'll provide

U.S.A. v. Southern Coal - 5/14/2021

with you the identity, of which I understand five do not discharge water, only three discharge water. Each of those outlets since the permit -- I'm sorry, since the consent decree was put in place have been sampled twice a month. And in the entire history of the consent decree, there have been no violations of the permits to date. Obviously, there has been no harm to the receiving streams that are covered by these permits.

The government has determined that the permits themselves are not even required going further, and they've been withdrawn. We believe that the penalty of $1,258,000 is grossly disproportionate, unreasonable, and arbitrary and capricious.

THE COURT: Mr. Carey, let me ask you a question.

MR. CAREY: Yes, Your Honor.

THE COURT: During the periods that are covered that are set forth in this chart under lapse in permit coverage as of May 6th 20 -- it's really May 6th, 2020, through August 25, 2020, and it's $1,000 per day. Did the sampling go on during this period of May 6th through August 25, 2020?

MR. CAREY: Yes, Your Honor. We have continued to sample the entire period to date. We're still sampling. Even though we have withdrawn the permits, OSM wants us to continue to sample the water, so we're doing so. So during that entire time, May 6th, 2020, we sampled twice a month. Of course, if

there's no water you can't take a sample, but you record that it's not discharging.  But as you can see, the penalties go up from $1,000 a day to the higher category of $4,500 a day.  So those penalties are assessed for, as I said, for water that was compliant with the permits even though --

THE COURT:  Yeah, I see that.  The penalties go up based on how long they've been out of the compliance.

MR. CAREY:  That's correct, Your Honor.

THE COURT:  No.  I get that.  All right.

MR. CAREY:  Now I'd like to address a few other comments made by Mr. Casey.  When you asked him about this very point, that the government -- or the plaintiffs -- I'm sorry, the defendants contend that there's been no harm to the environment and that this is a paperwork violation, he points to our, quote, "horrendous compliance history."  He noted that there had been 23,000 penalties resolved by the consent decree, and that since the consent decree went in place, we've paid about $2.9 million in stipulated penalties.  And I think that really does bring into perspective what's going on here.

It is true that we have paid $2.9 million, but an analysis of the quarterly reports, and those are the reports that the company submits self-reporting the violations to the government, calculating the stipulated penalties, and paying the money to the government, which we've been doing since the inception of the quarterly report, the total number of

violations are 1,283.  Those are 99 percent effluent violations.  In other words, we exceeded the amount of a particular pollutant, whether it's magnesium or pH, or whatever it is, and we paid the penalties.

But since we've been under the consent decree, we have 36 companies, 171 NPDES permits, and we have 1,119 active outlets.  So 1,200 violations over 1,100 outlets means, on average, one outlet a year over four years.

Now, in truth, there are many outlets that never violate and there are some that violate more than others, but if you put them in perspective, we think we've made significant improvements.  And that $2.9 million is actually being paid for an effluent violation where there's potential harm to the environment.  They now want to assess us $3.2 million for simply having a lapsed permit where you have four outlets discharging water and it's completely compliant.  There is no correlation between those kinds of numbers.

He also made note of the fact that the work in Tennessee is, quote, "not finished as of April of 2021."  I would like to just give a brief history of the remediation.

In September of 2020, they identified the work that was needed to be done.  By the end of -- or September 25th, our company had contracted with an independent contractor to do the work, which was mostly completed in the second week of November.  TDEC then provided us with a punch list of the

remaining work they thought -- the work that still needed to be done. That was done at the end of December and the first part of January. And on January the 11th, TDEC conducted an inspection and sent us a letter later saying that based on the inspection and our information provided to TDEC, they have determined that all punch list items have been completed. That's docket Number 26-5, page 2719.

Now, there were ongoing discussions with TDEC, and they said in the spring we're going to have to go back and check and make sure all the seeded sites are growing again. Well, a month ago, we did that an our own. We went back out and we reseeded some sites that didn't have growth, and there may still be some that needs to be done.

And let me say this, Judge: You don't need to order the company to do that work. They're going to complete that work, and we agree we have to complete that work. There is no dispute among the parties about that. It is our obligation under the permits to finish that work, and even though they've been withdrawn, we also have to do it to comply with OSM. So the work is going to be done.

He makes mention to the fact that we waited eight months, although, I think it's seven months, to invoke the dispute resolution. But we had had a course of conduct that suggests that was, again, because there was no deadline under the consent decree to file our notice, we had negotiated over

five months on a dispute involving a claim by the government for 221,000, and after about five months, we agreed to resolve it for 50,000. So we thought we had an ongoing relationship where we continued to talk. We weren't aware they were going to file it and they did. Again, because there is no deadline the Court can certainly undertake to review it.

One final thing. The Court was asking Mr. Fowler and Mr. Casey about -- well, Mr. Fowler about paragraph 63, which has the language to comply with the terms of your permits. And you also asked Mr. Casey about whether the letter of credit money could be used to pay for the stipulated penalties. I agree they cannot be used to pay for stipulated penalties, but it is a great example of why 63 is in there. It says that, for purposes of 63, the work includes all steps to comply with your permits.

What happened in Tennessee is Tennessee regulators determined we need to make some reclamation remediation work to those three permits to keep water from flowing and to stabilize the site. And because Mr. Casey and the government thought we weren't moving fast enough, he then undertook to draw down on the letter of credit.

That is work that is required to be performed under the NPDES permit. It's not work that's required under the consent decree. But he can use the financial assurance portion of the consent decree to draw down on the letter of

credit to make sure there are monies available to do that physical work.

He keeps mentioning that we filed a notice of dispute in relation to that. Yes. That was a different issue. The issue there was the letter of credit had a balance of $1.5 million. The estimates that we were hearing from the regulators is that it might cost as much as $200,000 to do the work but not one and a half. So my dispute with him was, you shouldn't draw down the full one and a half million, you should only draw down the 200,000. And I said, "If you don't agree with me, please be advised I'm invoking the informal dispute resolution process." It was for that issue, not for the stipulated penalties. The stipulated penalties, as I say, we did file the notice of dispute in March, it has now been completed, and the issue is ripe for you to decide. And we believe that the Court should substantially reduce the penalties to a reasonable number. And if you have any questions, I'll be happy to answer them.

THE COURT: Thank you, Mr. Carey. I appreciate your presentation.

Let's hear from the plaintiffs again. We'll start with Mr. Casey and then we'll hear whether Mr. Tambling or Mr. Buntin or Ms. Blanton want to say anything in response.

And I will tell you, we've been going on for several hours now. I do have another commitment. I've got to be --

I've got to be out of the here by 3:30 because I have another commitment that I have to be at at 3:45.  Actually, the commitment started at 2:45.  I have punted on the first part and I'm just doing the second part.  So if you-all could try to wrap up in the next 20 minutes, that would help me a lot.

MR. CASEY:  Sure, Your Honor.  Thank you very much.  We had a lot of issues to go through here.  I think I had 14 issues with Mr. Fowler and a number of issues with Mr. Carey.

If I can go through those really quick.  Mr. Fowler talked about paragraph 63.  He said and all necessary action, that last provision that the Court noticed, he said that is not included in the definition.  It is clearly included in the definition, so we disagree with his argument, okay?

The next issue he said was the government is only entitled to $3,000.  I have no idea where that comes from.  And the consent decree doesn't say, "Comply with the Clean Water Act."  I think that's a misstatement of law.  There's no sense having a court order a defendant to comply with law.  But we certainly included compliance with the NPDES permits is provided clearly in paragraphs 22, 29, and 63, okay?

The third thing he indicated was the consent decree regulates effluence -- regulates effluence, and there's stipulated penalties there.  If you look at paragraph 85, there's a complete regimen in there for different types of violations: violations for reporting, violations for

U.S.A. v. Southern Coal - 5/14/2021

effluence -- effluent limit violations, and there's also in paragraph 85 stipulated penalties for violations of the consent decree itself.

The fourth thing he mentioned was the government has a remedy and original action. That's correct, Your Honor, we could have brought another lawsuit and we could seek the statutory maximum of over $55,000 per day. No, the only intent here was to have an agreement with the defendants that they would implement the program that we laid out in the consent decree after negotiating those terms for two years, and if there were violations, we have reasonable amounts: 1,000, 2,500, or $4,500 per day, not the statutory max.

The fifth thing he mentioned was 22 is not a mandate, and it indicates that -- the "work." The "work" there is used colloquially [pronouncing] -- I have a hard time with that word, Your Honor, but it's the regular -- it's the regular work -- all the work required under the consent decree. If there's any of the work, whether it's the injunctive relief, whether it's compliance with the web reporting, whether it is reporting timely if there's an emergency under *force majeure*, all of that work under paragraph 22 says if you're doing something and it requires a permit, you must comply with the permit terms. And 29 says if you're required to do work that needs a permit, then you must timely apply or reapply for those permits.

Paragraph 22, he indicated -- oh, he talked about the NPDES being issued before the consent decree.  We're fully aware of that, Your Honor, and that's a whole provision in there that they must comply with those permits, and if they just let them expire and we have no notice of that, then there would be no compliance that could be monitored under the terms of this consent decree.

The big issue was capital W versus a small W.  Like I said earlier, the definition of capital W "Work" in paragraph 14(eee) refers to paragraph 63.  And that definition says "Work," capital W, is defined as Section -- Section 6, the compliance requirements.  That section includes paragraphs 22 and 29, as we talked about earlier.

As far as other consent decrees, they quoted "that shall comply with the Clean Water Act and shall comply with the permits," that is incorporated here not in the same particular way as other consent decrees, and we are not comparing this consent decree to another consent decree, what Mr. Fowler did, but those words are exactly in the definition, which is referred to from paragraph 14(eee) to paragraph 63, includes that very same language.  And I assume that when the drafters and the counsel for the different parties were negotiating, they just said, "Look, let's just refer to this other section that has those words in it and incorporate it there without having to write it again."

When he indicated his tenth point was that "work" only applies to the Financial Assurance Section, that's not consistent with the definition section.  And it's not consistent with the definition of capital W "Work" which specifically includes Section 6 of the consent decree incorporating paragraphs 22 and 29, among others.

It's interesting that they would argue that work only applies and you could only use that if we went and took their money and used that money to fund a trustee who had to hire contractors to go and reapply for their expired permits.  It doesn't make any sense whatsoever to do that when that's something that they're required to do under the exact -- the specific terms of the consent decree.

The twelfth point he made was to -- the paragraph on the new facilities.  I'm not exactly sure what he was indicating, but he said the provisions of work are not there.  Of course, this whole consent decree, if you look -- I don't have the cite right off the top of my head, Your Honor; there's a lot of paragraphs, like I said.  But any of the new facilities are subject to the terms of this consent decree.  That's the important part about this consent decree, is it not only applies to the facilities where the violation was, it was imposed company wide to -- I was trying to find the exact language, for all -- but it would apply company wide and it was prospective in that any new facilities that were brought

U.S.A. v. Southern Coal - 5/14/2021

into the company, they would be subject to the terms of this consent decree.

THE COURT:  I think he was talking about paragraph 33.

MR. CASEY:  I think it was paragraph 33.  That's right, Your Honor.  But there's another provision and I can submit it to the Court that requires any new facilities, they have to require -- they have to comply with the terms of this consent decree.  I can submit that to the Court if you would like, but it is in that consent decree.

They talk about -- he talked about other consent decrees.  We talked about that a little bit, that include the language about ensuring compliance with NPDES permits.  That language is already there.  It's in paragraphs 22, 29, and 63, as the Court identified earlier in this hearing.

And he said that the government knows how to say "comply with the NPDES permits."  If you look at those particular paragraphs, that's exactly what it says.

He talked about paragraph 63 and it is vague and it was being hidden in a mousehole.  I'm not sure how that applies, so I won't comment on that.

Mike Carey indicated that we never told them and that we filed a motion.  Let me just say, we had a demand in September of 2020 for stipulated penalties and for work, and under the terms of the consent decree, agreed to by the

defendants and approved by the Court, we required them to do work within a reasonable time, in 30 days, and pay the penalties in 30 days pursuant to paragraph 92.  They didn't do that.  They didn't seek dispute resolution on that, and we didn't file our motion until about eight, eight months later, you know.  I don't know why that would be a surprise.  When they didn't do the work, when they didn't pay the penalties, it was required under the terms of the consent decree.

He also cites the *Witco* case.  I want to talk just a minute on the *Witco* case.  The *Witco* case, in that case the defendants, they were under a consent decree.  They had ten days to serve dispute resolution, and the Court found that because they didn't do it until about, you know, no more than 30 days later they didn't consider it a material breach.  Here the dispute resolution wasn't issued until nine months after our demand and well after the date we filed our motion to compel.

In the *Witco* case, that involved a continuing accrual of stipulated penalties during the time that the case was being litigated and the court was determining the appropriate -- the liability, and it determined -- and that court found that every day that this court turned its attention to other matters pending before it, *Witco* became liable for an additional $12,000 a day in penalties, okay?  The *Witco* case ultimately held that the penalty did not bear

U.S.A. v. Southern Coal - 5/14/2021

on the culpability of *Witco* in delaying payment of its obligations, but, rather, the measures -- it rather measures the time taken by this court in rendering its opinion. That's not the case here and it's not applicable, Judge.

We are not seeking any further penalties than what we requested in our demand. And, in fact, the reason in Alabama that other mines -- the undercurrent and discharges were not listed in that exhibit, which was the -- which is document 26-4, page 26 of 55, the reason why there's not more discharges listed for those expired permits is because at the date that ADEM calculated those penalties and crafted that chart, those discharges hadn't occurred -- the permits hadn't expired by then, so they were only issued a violation for failure to timely comply. The permit subsequently expired and there were discharges, but we're not seeking penalties for those. We're not seeking continuing violation stipulated penalties. We're not seeking interest for any of those.

I talked about *Witco*.

In Alabama, Mr. Carey talked about the third application. So after their permit expired, they submitted -- before it expired, they submitted their first application, which was not within -- which was not 180 days before the permit expired, so it was late. That permit was denied because it was incomplete. They then submitted a second application. It was denied. It was incomplete.

A third application was finally -- was finally submitted and Alabama continued to review it and there was some discussion about -- there was an MOU between the ADEM and the Surface Mining Commission about the different types of permits.  There's a surface mining permit, there's a national pollution discharge elimination system permit.  And so eventually ADEM issued the permit not realizing that they -- and the reason for confusion was that the defendant Justice Coal of Alabama let its surface mine permit lapse as well, let it expire.  And so as Mr. Carey indicated, I made a good faith offer to the defendants, and I've talked to Mike Carey a couple of times, and his client last night, and I said, "Look, if you're asking for 180 days as a reasonable time period, plus the days, you know, between the time the permit expired and your third complete application, I would recommend that to ADEM."  And, you know, that's as far as it's gone, Your Honor. So I can't -- you can bring -- you know, you can lead a horse to water but you can't make it drink.  So that's where we are on that.

THE COURT:  It also sounds to me like it's sort of Rule 406 settlement negotiations.  That's what it sounds to me like as well.

MR. CASEY:  That's right.  That was my offer and I didn't discuss any of their responses or discussions about that, so I haven't revealed any confidentiality or any of the

settlement discussions, Your Honor.

He talked about the Tennessee penalties.  Your Honor, there's nothing in this consent decree -- this was negotiated, these terms were negotiated by sophisticated counsel with input from experts on both sides over a two-year period.  This is what we agreed to.  Instead of going to trial and letting a court make a determination and assess penalties under the Clean Water Act, under 33 U.S.C. 1319(d), and looking at the factors to assess a penalty, economic benefit, harm, you know, that sort of stuff, we have an agreement in terms -- there's nothing in those terms that allows this Court to weigh those mandatory stipulated penalties.  They agreed to it.  They agreed.  They said, "Look, if we make this mistake, we will pay this amount."  It's only $1,000 a day, or 2,500 a day. It's not over $50,000 a day.

As far as the history, again, that's a factor under the Clean Water Act in litigation, and so there are no terms in this consent decree, as they agreed to it, for weighing the evidence.  Whether there's environmental harm, whether there's a history of effluent violations, those are all factors under 33 U.S.C. 1319(d).

The fact that they were still sampling, you know, and they don't have a lot of violations, these sites where these permits expired, by the way, have been inactive.  The coal business has not been good; they have not been mining.  But

they keep these permits and they keep these sites hoping that the market will get better, and when they get better, they're ready to go, they have the permits in place.

And meanwhile, even if they're not mining, they may have discharges from these sites because they're not fully reclaimed.  Where they're not reclaimed, there's a lot of the ground that has been disturbed; the vegetation has been removed; you know, in places it's strip mining.  I've been out to these sites.  And when it rains -- there's roads built up to get up to these areas where the coal veins are -- there's runoff.  And they've put in sediment ponds and other things, so there's still discharges even if they're not mining.

I looked at a lot a few years ago when we were negotiating this consent decree, and there's a lot of runoff just from the roads because there's no vegetation.  They haven't completed the work at the three mines in Tennessee, so although they have requested or formally withdrawn the permit applications, that hasn't been granted by Tennessee, because for the three sites that we seek stipulated penalties for, not other eight which had expired too, those sites still will be required to have permits until the work is completed and the sites are stable.

As far as -- let me see.  I think that's about it, Your Honor.  I think I've addressed all the points that counsel for the defendants have made.

THE COURT: Mr. Casey, thank you for that.

Do the folks from Alabama, Mr. Tambling or Ms. Blanton, have anything you would like to add?

MR. TAMBLING: Your Honor, I guess the only statement that we would like to just add to this is that consent decrees are enforceable only because they include provisions for stipulated penalties. I think Alabama would be concerned that if Southern Coal can somehow circumvent the terms and conditions of their consent decree by arguing that renewing and maintaining permits are important under the terms and conditions of the consent decree, or that somehow the stipulated penalty are now unfair, then it kind raises the question of how can you possibly enforce these consent decrees?

THE COURT: Well, you know, this Court is not going to rewrite the contract. This is a contract. The parties agreed to a contract. The parties agreed to certain terms. And I understand why maybe the court in *Witco* said, "It took me six months to get a decision out so I shouldn't penalize the parties while the court was making up its mind." I get that, okay? But this is different. Y'all aren't seeking the same thing.

I'll look at the cases that they've cited, but, you know, I may have graduated from law school 40 years ago this month, but, you know, it seems to me the law hasn't changed,

and that is the courts aren't in the business of rewriting contracts for parties.

MR. TAMBLING:  Thank you, Judge.

THE COURT:  Ms. Blanton or Mr. Buntin, anything from you-all?

MS. BLANTON:  I have no comment, Your Honor.

THE COURT:  Thank you, Ms. Blanton.

Mr. Buntin.

MR. BUNTIN:  Yes, Your Honor.

THE COURT:  Mr. Buntin, you're muted.

MR. BUNTIN:  My apologies.  Can you hear me now?

THE COURT:  Yes, sir.

MR. BUNTIN:  I apologize for that.

I wanted to speak very briefly to a comment made by Mr. Carey concerning a letter sent by the Tennessee Environmental Agency, which I represent, and it's called TDEC. And that letter is September 21st, 2020.  I don't have a docket number for that, but I believe that letter is attached to the defendants' motions in opposition to the motion to compel.

In that letter, TDEC said, "You may withdraw your applications if the sites are stable."  That's a big "if" that the Court needs to really focus on.  If the site is stable, then of course it doesn't need a permit and you can withdraw your application because there's going to be no discharge.  So

the statement that TDEC said, "You can withdraw your permits," period, the end, there's more to that story than just that. You've got to stabilize them.  As of now two of the three sites are --

THE COURT:  And I've looked at some of these photographs that are attached to some of the things, and it looks like maybe there might be some more work that needs to be done to some of these, because it looks like, you know, the grass didn't take, and there's some areas where it looks like you've got some runoffs.

MR. BUNTIN:  Yes, Your Honor, that's exactly right. Two of the three sites in Tennessee are still not sufficiently stable.  And to my knowledge, these sites still do not have any permit coverage as of today.

THE COURT:  All right.  Well, thank you for that, Mr. Buntin.

Anything else you want to say?

MR. BUNTIN:  No, Your Honor.  Thank you.

THE COURT:  Thank you so much.

We've been going almost three hours.  I find the arguments interesting and not tedious.  They don't hurt my head yet.  Maybe when I start thinking about them deeply they might hurt my head.  But let me give you-all some direction, if you don't mind.

I would like the plaintiffs to submit to me the

permits for the six sites in question that were in place at the time the consent decree was filed. I think those six sites -- I wrote them down: Alabama's Crane Central, Glade Preparation, and Poore Kirby, it looks like. And in Tennessee it looks like it's Refuse Area Number 2, Mine 5A and Mine 20. Those look like the six sites at issue to me.

I would like to see myself the permits that were in place at the time the consent decree was filed. Then I would like a chronology or documents that relate to when the new permit applications were made and what happened with those new permit applications for those six sites. I would like to see that. I think it bears on my reading of paragraph 63 of this agreement, this consent decree.

Next, I don't want to cut off anybody's ability to argue here, so I'm going to give each side -- there's a lot of stuff to cover here, okay? There's a lot. You've gotten nearly three times as much time as you will get at the Court of Appeals. But I don't want to cut you off, so I'm going to give each side 14 days to file any additional sort of post hearing comments you would like to make, points of emphasis you want me to focus on.

I would like you to constrain yourselves to ten pages, because I've got a lot of paper already. You don't have to repeat things. If they're said already, they're said already. Maybe like a greatest hits from each side. If you

U.S.A. v. Southern Coal - 5/14/2021

could in ten pages or so provide me with any additional argument or any emphasis, points of emphasis you want to make for me, okay, that, "Wait a minute.  I want Urbanski to remember this."  Okay?  So give me ten pages, points of emphasis.  You can attach whatever exhibits you want to that.  Like, for example, from the government I want these permits, all that permit information.  That would be helpful to me in sort of distilling what I've listened to today.

I've tried to pay attention, I've tried to listen, I have no -- I'm no environmental expert or Clean Water Act expert.  Unfortunately, us district court judges have to be generalists.  And you guys know a lot more about this than I do, so help me out and try to distill your arguments down to ten pages each, and let me know what I ought to focus on as I'm considering this.

I have drilled down on it.  I think I've got a pretty good idea where I'm going, but I would like the benefit of -- each side makes good points, and I want the benefit of you-all taking a few days to recap from today's hearing and give me ten pages of distilled argument that might be helpful.  Okay?

MR. CASEY:  Yes, sir.  Thank you very much, Your Honor.  Appreciate your time.

THE COURT:  I'm glad to do it.

Mr. Fowler and Mr. Carey, anything else from you guys?

U.S.A. v. Southern Coal - 5/14/2021

MR. FOWLER:  No, Your Honor.  We'll provide that in the document that you requested.

THE COURT:  That would be helpful.  I appreciate it.

Let me ask you this:  Would any of the parties be interested in sitting down with a United States magistrate judge to try to -- Judge Ballou, my colleague, is a tremendous mediator, and I just wonder if sitting down with him and hashing through like we did today might be something that either party might be interested in?

MR. CAREY:  Your Honor, this is Mike Carey on behalf of the defendants.  I believe there's always benefit in trying to resolve it, so we would welcome the opportunity to get together and try to get this case resolved.

THE COURT:  And Mr. Houchens can tell you about Judge Ballou.  I was a magistrate judge for seven years, and I've been a district judge now for ten years.  I've mediated about 400 cases.  Judge Ballou tells me he is mediating two cases a week these days on Zoom.  And he's mediated something crazy, like 140 cases since the start of the pandemic on Zoom.

MR. HOUCHENS:  And it's a fantastic process and experience.  Their breakout rooms are wonderful.  I've done a couple since the pandemic has started with Judge Ballou.  He is the finest that I've seen at it, and I would encourage all the parties, to the extent my opinion matters at all, which it doesn't, to engage in that process.

U.S.A. v. Southern Coal - 5/14/2021

THE COURT:  I think maybe, Mr. Casey, you and Mr. Buntin and Mr. Tambling and Ms. Blanton, y'all talk about whether or not that might be something you might be interested in.

MR. CASEY:  Sure, Your Honor.  We will talk about that.  I'm sure that's something we would be interested in.

THE COURT:  All you have to do is send me an e-mail, copy all the parties and let me know.  And, you know, with that in mind, with that in mind these ten pages of distilled argument you're giving me might be a nice premediation statement.

MR. CASEY:  Okay.  Do you want us to -- for each of us to e-mail those ten pages to you, Judge?

THE COURT:  Those ten pages, no, I want you to docket those.

MR. CASEY:  Okay.

THE COURT:  Those are like supplemental briefs requested by the Court.  And I really want to see those permits.  I want to see what they say, okay?

MR. CASEY:  Sure.  I did submit to the -- I'm trying to think which ones I just submitted the other day in our response to the motion for judicial resolution.  I submitted --

THE COURT:  I didn't look at the brief that came in yesterday because I didn't have time.  Because yesterday I was

in court all day, and today I've been with Mr. Houchens, and today I've been in court this morning for three hours, so I didn't get a chance to look at yesterday's brief yet, and I apologize for that.

MR. CASEY: No problem. Not all of them --

THE COURT: The law clerk did. The law clerk did. Sorry, Mr. Casey. Go ahead.

MR. CASEY: No. I'm saying I did not submit all six of those. I just submitted the ones that were discussed in the arguments regarding the 180-day requirement. I just submitted not the whole -- the permits actually are quite long. I submitted the relevant pages of part 2 of the permits, which are exactly the same. They're under Federal Clean Water Act NPDES permits that provide that they must be renewed 180 days. They all say the same thing, at least the ones I submitted to the Court, you'll see. If you want the whole permits, I can do that. I think they're only 50 or 60 pages.

THE COURT: That's nothing. 50, 60 pages is a piece of cake.

MR. CASEY: Okay. No problem.

THE COURT: And make sure that not only do you send me the permits, I want the chronology of when they were applied for, when they were rejected, when they were incomplete. I want the chronology that follows as well, okay?

U.S.A. v. Southern Coal - 5/14/2021

MR. CASEY:  Yes, sir.

THE COURT:  Thank you-all so much.  I really appreciate everybody's willingness.  This case was transferred to me because Judge Conrad went on medical leave, so that's why the case was transferred to me.  He is at present not hearing any cases, and, fortunately, I was able to squeeze the time in.  I thank you-all.  Again I apologize for the delay earlier.  We will give this our full attention, and it's been a pleasure having you-all argue here by videoconference.

MR. CASEY:  Thank you very much, Your Honor.

MR. HOUCHENS:  Have a great weekend, everybody.

THE COURT:  Take care.

(Court recessed at 3:26 p.m.)


                        CERTIFICATE

I, Judy K. Webb, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/  Judy K. Webb              Date: 1/5/2022