**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-1110

UNITED STATES OF AMERICA; STATE OF ALABAMA, EX REL. LUTHER STRANGE, in his official capacity as Attorney General of Alabama; ALABAMA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT; COMMONWEALTH OF KENTUCKY, ENERGY AND ENVIRONMENT CABINET; STATE OF TENNESSEE, EX REL. HERBERT H. SLATERY III, in his official capacity as the Attorney General and Reporter of Tennessee; COMMONWEALTH OF VIRGINIA,

    Plaintiffs - Appellees,

 v.

SOUTHERN COAL CORPORATION; PREMIUM COAL COMPANY, INCORPORATED,

    Defendants – Appellants,

 and

JUSTICE COAL OF ALABAMA, LLC; A&G COAL CORPORATION; FOUR STAR RESOURCES, LLC; INFINITY ENERGY, INCORPORATED; KENTUCKY FUEL CORPORATION; SEQUOIA ENERGY, LLC; VIRGINIA FUEL CORPORATION; NATIONAL COAL, LLC; S AND H MINING, INCORPORATED; AIRWAY RESOURCES, LLC; BADEN RECLAMATION COMPANY; BLACK RIVER COAL, LLC; CHESTNUT LAND HOLDINGS, LLC; MEG-LYNN LAND COMPANY, INCORPORATED; NINE MILE MINING, INCORPORATED; CANE PATCH MINING COMPANY, INCORPORATED; BLUESTONE RESOURCES, INCORPORATED; DYNAMIC ENERGY, INCORPORATED; GREENTHORN, LLC; JUSTICE HIGHWALL MINING, INCORPORATED; NATIONAL RESOURCES, INCORPORATED; NUFAC MINING COMPANY, INCORPORATED; PAY CAR MINING, INCORPORATED; SECOND STERLING CORPORATION; NEWGATE DEVELOPMENT OF BECKLEY, LLC.

    Defendants.

Appeal from the United States District Court for the Western District of Virginia, at Roanoke. Michael F. Urbanski, Chief District Judge. (7:16-cv-00462-MFU)

Argued: December 7, 2022                    Decided: April 4, 2023

Before WILKINSON and RUSHING, Circuit Judges, and FLOYD, Senior Circuit Judge.

Affirmed by published opinion. Senior Judge Floyd wrote the majority opinion, in which Judge Wilkinson joined. Judge Rushing wrote a separate opinion concurring in part and dissenting in part.

**ARGUED:** Robert Philip Fowler, SOUTHERN COAL CORPORATION, Birmingham, Alabama, for Appellants. David Seth Frankel, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Aaron B. Houchens, AARON B. HOUCHENS, P.C., Salem, Virginia; Michael W. Carey, S. Benjamin Bryant, CAREY DOUGLAS KESSLER & RUBY, PLLC, Charleston, West Virginia, for Appellants. Todd Kim, Assistant Attorney General, Patrick Casey, Michael T. Gray, Evelyn S. Ying, Environment and Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee United States. Robert D. Tambling, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama; Wilson S. Buntin, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF TENNESSEE, Nashville, Tennessee, for State Appellees.

FLOYD, Senior Circuit Judge:

Defendants-Appellants Southern Coal Corporation and Premium Coal Company, Inc., (collectively, "Southern Coal") ask this Court to reverse a district court's order granting a motion to compel compliance with a consent decree (the "Decree") to which they previously acquiesced.[1] The Decree operated to resolve allegations of approximately 23,693 Clean Water Act violations, pre-litigation, levied against Southern Coal by Plaintiffs-Appellees Alabama, Kentucky, Tennessee, Virginia, and the United States of America (collectively, the "government"). Because we conclude that the district court properly found the Decree's plain language to mandate compliance with the Clean Water Act and derivative permitting obligations, we affirm.

I.

A.

The Clean Water Act (CWA) aims to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In furtherance of that goal, the CWA prohibits pollutant discharges into the waters of the United States without authorization. *Id.* §§ 1311(a), 1342, 1362. Designed to regulate discharges, the CWA employs the National Pollutant Discharge Elimination System (NPDES), requiring

---

[1] Notably, the motion to compel compliance implicated three entities: Southern Coal Corporation, Premium Coal Company, Inc., and Justice Coal of Alabama, LLC. Justice Coal is not an appellant here, but its interests are nonetheless reflected by Southern Coal's participation, as Southern Coal is an operator of the Justice Coal facility implicated in this dispute and "controlled environmental compliance" for the facilities at issue here. Resp. Br. 3; *see also* Opening Br. 6 n.2.

3

polluters to obtain permits limiting the types and quantities of pollutants that they may discharge, and imposing discharge monitoring and reporting obligations. *Id.* § 1342. The Environmental Protection Agency (EPA) initially administers NPDES permitting for each state, but states may seek transfers of permitting authority to their own regulatory bodies. *Id.*; *see also Ohio Valley Env't Coal. v. Fola Coal Co.*, 845 F.3d 133, 136 (4th Cir. 2017). As relevant here, both Alabama and Tennessee oversee their own NPDES permitting. *See* 44 Fed. Reg. 61452 (Oct. 25, 1979) (approving Alabama's permitting program); 46 Fed. Reg. 51644-02 (Oct. 21, 1981) (approving Tennessee's permitting program).

To force permit holders to continually update their discharge-mitigation technologies, NDPES permits expire every five years. 33 U.S.C. §§ 1342(a)(3), (b)(1); *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 928 n.3 (5th Cir. 1998). Permits may be administratively extended if a permittee submits a renewal application more than 180 days prior to expiration. 40 C.F.R. §§ 122.6(a), 122.21(d)(2). A lapse in permit coverage renders any subsequent discharges violative of the CWA. 33 U.S.C. § 1311(a).

B.

Southern Coal discharges pollutants into the waters of the United States, and, as such, should maintain—and adhere to—NPDES permits for all relevant sites and facilities. But, according to the government, it oft falls short of this aspiration of authorization and compliance. Rather, the government contends that Southern Coal is a habitual violator of the CWA and derivative NPDES-permitting obligations.

4

In 2016, the government sued Southern Coal and more than thirty affiliated and unaffiliated mining and mining-adjacent companies under the CWA for violations of NPDES permits issued for operations in Alabama, Kentucky, Tennessee, Virginia, and West Virginia. In its complaint, the government alleged approximately 23,693 violations—over a period of five years—of the various limitations and conditions imposed by the pertinent NPDES permits. Joint Appendix ("J.A.") 11, 89. The complaint sought both injunctive relief and civil penalties under the CWA and equivalent state environmental laws.

The same day that the government filed the complaint, it filed notice of a proposed consent decree that it negotiated with Southern Coal—and other entities not party to this appeal—to resolve the complaint's allegations without proceeding to litigation. Among other things, the Decree contained civil penalties for past violations, imposed new monitoring and reporting obligations, provided stipulated penalties for future violations, and required the establishment of a trust for the purpose of financial assurance of enforcement costs. The government published the Decree to the Federal Register for thirty days of public comment. Following this comment period, the government filed an unopposed motion to enter the Decree, which the district court granted.

In 2020, the government sent a notice of default and demand for stipulated penalties to Southern Coal, alleging failures to comply with the Decree based on Southern Coal's allowing NPDES permits covering particular facilities in Alabama and Tennessee to lapse. In 2021, the government filed a motion in the district court to compel Southern Coal's compliance with the Decree. The district court granted the government's motion, awarding

5

stipulated penalties pursuant to the Decree and compelling compliance. Although Southern Coal contended that nothing in the Decree obligated it to renew NPDES permits, the court reasoned that it could not "end run the Consent Decree by allowing existing NPDES permits at covered facilities to lapse," thereby relieving it of obligations under the Decree and forcing the government to pursue violations by commencing separate actions under the CWA. *United States v. S. Coal Corp.*, No. 7:16-CV-462, 2021 WL 5814050, at *4 (W.D. Va. Dec. 7, 2021).

Southern Coal now seeks reversal of the district court's order granting the government's motion to compel. It argues that the district court improperly considered the purpose of the Decree and other extrinsic evidence—rather than only the plain language of the Decree itself—when concluding that the Decree required maintenance of NPDES permits. The government responds that the district court properly concluded that the plain language of the Decree required Southern Coal to maintain and renew the relevant NPDES permits, as well as to comply with the CWA in a general sense, and that the broader context surrounding the Decree further supports that conclusion.

II.

A.

This Court reviews the interpretation of a negotiated order—here, a consent decree—de novo. *Consumer Fin. Prot. Bureau v. Klopp*, 957 F.3d 454, 462 (4th Cir. 2020) (citations omitted).

B.

A consent decree resembles a contract, but "it is also a judicial or quasi-judicial act and the judicial imprimatur gives what would otherwise be only a contract the force of a judicial decree." *Willie M. v. Hunt*, 657 F.2d 55, 59 (4th Cir. 1981). Given that a consent decree is a product of careful negotiation and compromise, its scope "must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971). A defendant's waiver of rights to litigate certain issues—rights guaranteed by the Due Process Clause—is not to be perceived lightly, and "the conditions upon which he has given that waiver must be respected." *Id.* at 682.

However, given the contractual nature of a consent decree, "reliance upon certain aids to construction is proper," including consideration of "the circumstances surrounding the formation of the consent [decree], . . . and any other documents expressly incorporated in the decree." *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975). Thus, this Court may consider the surrounding circumstances and "the general nature of the remedy . . . agreed upon" in a decree without running afoul of *Armour*'s four-corners rule. *Willie M.*, 657 F.2d at 60.

Here, Southern Coal vehemently disputes whether this Court may deviate from strict adherence to the four-corners rule established by the Supreme Court in *Armour*. But even if we decline to consider the Decree's general nature and surrounding circumstances, its plain language supports the conclusion that it imposed on Southern Coal an obligation to maintain NPDES permits and otherwise comply with the CWA.

7

The government's notice of default and its motion to compel compliance relied largely on Decree paragraphs 22 and 29 for the proposition that the Decree obligated Southern Coal to maintain NPDES permits. Those paragraphs reside within the "General Compliance Requirements" section of the Decree. J.A. 117. Paragraph 22 provides that "[Southern Coal] shall perform the work required by this [Decree] in compliance with the requirements of all applicable federal, state, and local laws, regulations, and permits." *Id.* Paragraph 29 provides that "[w]here any compliance obligation under this Decree requires [Southern Coal] to obtain a federal, state, or local permit or approval, [Southern Coal] shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals." J.A. 119.

Southern Coal contends that paragraphs 22 and 29 do not contain any explicit references to NPDES permits or the CWA, and that, if considered in a vacuum, neither paragraph contains standalone substantive requirements that obligate NPDES or CWA compliance. But explicit invocations of NPDES permitting or the CWA are hardly necessary to the extent that the Decree speaks in straightforward, sweeping terms mandating compliance with "all applicable federal law," J.A. 117, and acquisition of "all" necessary "permits or approvals." J.A. 119. Furthermore, Southern Coal offers no justification for evaluating portions of the Decree in a vacuum, and doing so makes little sense. When considered together, and in harmony with the plain language of other provisions of the Decree, the mandates that Southern Coal comply with federal law and acquire permits where necessary plainly impose NPDES-permitting obligations and prohibit unpermitted discharges that run afoul of the CWA. To conclude that the

8

uncomplicated mandates in paragraphs 22 and 29 somehow carve out CWA compliance and NPDES permitting requires a tortured interpretation hardly reconcilable with Southern Coal's purported stance that we adhere to the plain language within the four corners of the Decree.

Southern Coal also argues that its compliance and permitting obligations under paragraphs 22 and 29 relate only to substantive work borne of other performance obligations under the Decree—not to NPDES or CWA compliance. For example, if the Decree were to require any reclamation work, Southern Coal contends that these paragraphs would operate to mandate compliance with reclamation permitting requirements pertaining to things like stormwater management. But, adhering to the four-corners rule, as Southern Coal purports we must, the plain language of the Decree does not distinguish between compliance with preconditions to performance—like NPDES permitting or the CWA—and subsequent, derivative obligations—like stormwater permitting.

The plain language of many other paragraphs implies compliance with the CWA and NPDES-permitting obligations as conditions precedent to Decree performance. For example, the Decree defines a covered facility as one that was "ever subject to or should have been subject to permitting under . . . NPDES."[2] J.A. 111. Paragraph 42 requires that

---

[2] This sweeping definition of a covered facility effectively renders the Decree applicable anywhere and everywhere that discharges occur or have occurred, including where such discharges were wholly unpermitted and otherwise only subject to liability as CWA violations—and not just as permit violations. Such express, broad applicability of the Decree is consistent with the circumstances surrounding it and the general nature of the remedy it sought. *See ITT Cont'l*, 420 U.S. at 238; *Willie M.*, 657 F.2d at 60.

9

Southern Coal undergo environmental audits to evaluate all facilities' compliance with applicable environmental laws, which necessarily include the CWA and NPDES. J.A. 127. Paragraph 43 requires that these audits be performed by persons with "relevant experience with the requirements of NPDES" and treatment systems for the "relevant effluent parameters in [Southern Coal's] NPDES [p]ermits." J.A. 128. Paragraph 44 requires that, for purposes of sampling during these required audits, sample locations must "be clearly marked with a sign that includes [Southern Coal's] NPDES . . . [p]ermit numbers." *Id.* Paragraph 45 requires inspection of all discharge outlets "as required by the NPDES permit(s) applicable to [each] site[]." J.A. 129. Paragraph 47 provides that Southern Coal must "implement a response plan for Effluent Limit and Failure to Sample Violations, which shall provide for investigation of any such violations and implementation of actions necessary to achieve compliance with the applicable NPDES [p]ermit limits and requirements." J.A. 130. That paragraph continues on to require Southern Coal to "implement the recommended preventive and treatment measures and [to] continue daily monitoring until the Outlet returns to compliance" with NPDES permits. J.A. 131. Paragraphs 49 and 50 require Southern Coal to create a violation-tracking database—identifying each violation by the NPDES permit number relating to it, the name of the relevant permittee, and the precise location of the violating outlet. Southern Coal must also establish a publicly available website providing real-time access to its NPDES permits, pursuant to paragraph 58. Paragraph 77 describes an NPDES permit violation as an "event affecting [Southern Coal's] performance under [the] Decree." J.A. 144. Paragraphs 84 and 85 provide stipulated damages where Southern Coal "fail[s] to perform any obligation

10

required by the terms of this Decree," which necessarily includes those obligations directly tied to the existence of NPDES permits. J.A. 145. Indeed, failure to perform includes "any exceedance of a maximum daily discharge limitation for any parameters set forth in [Southern Coal's] NPDES [p]ermits," reporting violations, auditing violations, and more. J.A. 108; 145–46. Worthy of emphasis, each of these paragraphs and their accompanying directives applies not only where an NPDES permit exists, but also where one should exist. J.A. 111. Thus, the Decree's obligations logically extend where a permit has lapsed and where none existed in the first place—i.e., to unpermitted discharges.

Taken together, these paragraphs—and others—plainly require Southern Coal to possess and maintain NPDES permits, as well as comply with the CWA, as conditions precedent to the ability perform under the Decree. The absence of NPDES permits would render compliance with many obligations under the Decree impossible, given that such obligations trace directly to baselines that NPDES permits provide. Thus, even if the plain language of the Decree does not employ excruciating detail in stating something to the effect of "Southern Coal must maintain NPDES permits and comply with the CWA," such obligations are clearly and plainly presumed by the numerous other obligations the performance of which relies on CWA and NPDES compliance.

The district court properly recognized the absurdity of Southern Coal's position that it could simply allow its permits to lapse to avoid obligations under the Decree. The court explained that "adopting [Southern Coal's] proposed interpretation of the [Decree] would generate absurd results. Indeed, if the [Decree] did not bar [Southern Coal] from operating sites without NPDES permits, they could avoid the [Decree's] requirements altogether by

11

simply allowing their permits to expire." *S. Coal. Corp.*, 2021 WL 5814050, at *5. The plain language of the Decree does not lend itself to such an exit strategy for Southern Coal. In fact, by way of example, it contains several paragraphs dedicated to ensuring that Southern Coal could not shed compliance obligations by transferring facility ownership. J.A. 104–06. It also provides express terms of termination, none of which contemplate the deliberate lapsing of NPDES permits. J.A. 166–67.

Although the plain language of the Decree clearly supports the district court's conclusion that Southern Coal was obligated to maintain NPDES permits—and that alone is sufficient basis to affirm—this Court may also consider the circumstances surrounding the Decree and the general nature of the remedy agreed upon. *See ITT Cont'l*, 420 U.S. at 238; *Willie M.*, 657 F.2d at 60. Here, the underlying dispute revolved around tens of thousands of NPDES-permitting and CWA violations. It cannot reasonably be argued that, in formulating the Decree, the parties contemplated undermining its efficacy by authorizing the exact conduct that it sought to remedy. If Southern Coal intended such a backdoor to compliance, then it likely did not negotiate the Decree in "good faith" to forge an agreement that was "fair, reasonable, and in the public interest," as it purported to do as a Decree signatory. J.A. 102.

Notably, Southern Coal takes great issue with the district court's statement that the company's position "would undermine the entire purpose of the [Decree]." *S. Coal Corp.*, 2021 WL 5814050, at *5. Southern Coal argues that this invocation of "purpose" runs afoul of *Armour*'s four-corners rule by engaging in speculation that infringes upon the Due Process rights sacrificed by the entity in the Decree-negotiation process. But Southern

12

Coal's argument is unpersuasive. Although it is correct that *Armour* prohibits speculation as to a consent decree's purpose, *see* 402 U.S. at 681–82, the district court's comment here was entirely inconsequential. Rather, it followed the district court's meticulous analysis of the plain language of the Decree, and Southern Coal calls attention to it now as a cherry-picked blemish amidst an overwhelmingly correct analysis. Even if this invocation of "purpose" constitutes error, it did "not affect the substantial rights of the parties." 28 U.S.C. § 2111. Thus, insufficient basis exists to reverse on this statement alone.

## III.

We do not lightly perceive the Decree's status as a carefully negotiated, carefully crafted document that reflects not concessions to liability for underlying complaint allegations, but instead a discerning, good-faith compromise between the parties in lieu of costly litigation. However, our respect for the terms of the Decree does not blind us to absurd interpretations of its plain language. Not only does the Decree plainly mandate compliance with all federal law and permitting obligations, but numerous terms rely on CWA compliance and the maintenance of NPDES permits as conditions precedent to performance. The district court correctly construed the Decree's language and barred Southern Coal from surreptitiously escaping the bargain struck.

*AFFIRMED*

RUSHING, Circuit Judge, concurring in part and dissenting in part:

The Government claims that Southern Coal violated the consent decree in two ways: first, by failing to maintain its NPDES permits and, second, by discharging pollutants after those NPDES permits had expired (what the Government calls "unpermitted discharges"). The district court agreed with the Government and imposed penalties of $2,523,000 for the failure to maintain permits and $21,000 for the unpermitted discharges. The majority agrees that both actions violated the consent decree and so affirms. But I read the decree a little differently. While I agree that the consent decree required Southern Coal to maintain NPDES permits, I disagree that it prohibited unpermitted discharges. So I respectfully dissent in part.

I.

Begin with where the majority and I agree. By failing to maintain its NPDES permits, Southern Coal violated the terms of the consent decree. We construe a consent decree "basically as a contract," *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975), and are "'constrained by the language of the decree,'" *Consumer Fin. Prot. Bureau v. Klopp*, 957 F.3d 454, 463 (4th Cir. 2020) (quoting *Thompson v. U.S. Dep't of Housing & Urban Dev.*, 404 F.3d 821, 832 n.6 (4th Cir. 2005)). Paragraph 29 of the consent decree provides that "[w]here any compliance obligation under this Decree requires [Southern Coal] to obtain a federal, state, or local permit," Southern Coal will take all "actions necessary to obtain all such permits." J.A. 119. By its terms, this provision is not an obligation to obtain any specific permit. Instead, it requires a permit only if that permit is necessary to comply with another obligation.

14

So we ask: Is an NPDES permit necessary to comply with any obligation under the consent decree? Yes. In fact, NPDES permits are a necessary component of many such obligations. Take, for example, Paragraph 45, which requires Southern Coal to "conduct Outlet Inspections . . . as required by the NPDES permit(s) applicable to such sites." J.A. 129. Or consider Paragraph 47, which requires Southern Coal to "implement a response plan" for certain violations, which includes steps to "achieve compliance with the applicable NPDES Permit limits and requirements." J.A. 130. Various other provisions require Southern Coal to maintain databases that identify outlets by NPDES permit numbers, provide information about its NPDES permits, and to track any "NPDES effluent limit that was exceeded." J.A. 134. Finally, the financial assurance section requires Southern Coal to "tak[e] all necessary . . . actions to comply with [its] NPDES permits for the term of the Consent Decree."* J.A. 139. Southern Coal cannot meet these obligations without having NPDES permits. Paragraph 29's obligation to maintain those permits therefore applies, and Southern Coal's failure to do so violated the consent decree.

II.

Now turn to the point of disagreement. Unpermitted discharges unquestionably violate the CWA. But the question here is whether such discharges also violate the consent decree. They do not.

---

* Southern Coal apparently concedes that its failure to maintain its NPDES permits violated this provision. *See* Opening Br. 16. But it argues the Government cannot collect stipulated penalties for such a violation. This argument misses the point. Paragraph 29's requirement is triggered if *any* obligation requires an NPDES permit.

15

Put simply, no provision in the consent decree specifically prohibits Southern Coal from discharging pollutants without a permit. Neither the Government nor the majority identifies any provision making unpermitted discharges a violation of the consent decree. The Government relies instead on Paragraph 22, which it reads as requiring Southern Coal to comply with all the requirements of the CWA. And because unpermitted discharges violate the CWA, the argument goes, those discharges also violate the consent decree.

The Government misinterprets Paragraph 22. Much like Paragraph 29 above, Paragraph 22 does not contain an independent obligation to follow all the requirements of the CWA. Rather, Paragraph 22 says Southern Coal "shall perform the work required by this Consent Decree in compliance with the requirements of all applicable federal, state, and local laws, regulations, and permits." J.A. 117. In other words, when Southern Coal performs work required elsewhere in the consent decree, it must do so in conformity with applicable law. Paragraph 22 is not a freestanding obligation to comply with all the requirements of the CWA or, for that matter, with all other "federal, state, and local laws"—that would prove too much. Not even the Government claims it could collect stipulated penalties under the consent decree based on violations of, for example, federal or state tax laws. And although "the work required by this Consent Decree" includes complying with discharge limitations, the consent decree defines those limits exclusively by reference to NPDES permits. Unpermitted discharges are left unaddressed.

The majority makes two responses. First, the majority asserts this interpretation leads to absurd results because Southern Coal could avoid its consent decree obligations by letting its NPDES permits expire. Maj. Op. 11–12. But that is not so. As explained

16

above, the Government can collect stipulated penalties for Southern Coal's failure to maintain and follow its NPDES permits. It can also trigger the financial assurance section and conduct the work itself. And, of course, the Government can pursue remedies directly under the CWA. Second, the majority reasons that because the consent decree covers facilities that had or should have had NPDES permits, the obligations of the consent decree logically extend to unpermitted discharges. Maj. Op. 9, 11. But the fact that the consent decree applies to all facilities does not tell us what the consent decree requires of those facilities.

### III.

In view of the foregoing, I would affirm the district court in all respects except for the $21,000 in penalties awarded for Southern Coal's unpermitted discharges, which I would reverse.